No. 14215

IN THE SUPREME COURT OF THE STATE OF MONTANA

1978

---

NORTHERN PLAINS RESOURCE COUNCIL AND
NORTHERN CHEYENNE TRIBE, INC.,

Petitioners and Respondents,

-vs-

BOARD OF NATURAL RESOURCES AND CONSERVATION, et al.,

Respondents and Appellants.

---

Appeal from: District Court of the First Judicial District,
Honorable Gordon R. Bennett, Judge presiding.

Counsel of Record:

For Appellants:

W. H. Bellingham argued, Billings, Montana
John L. Peterson argued, Butte, Montana
Richard Andriolo argued, Bozeman, Montana
Maurice F. Hennessey argued, Butte, Montana
C. W. Leaphart, Jr., Helena, Montana
Neil S. Keefer, Billings, Montana
John W. Ross, Butte, Montana

For Respondents:

Leo C. Graybill, Jr. argued and Gregory Warner argued, Great Falls,
Montana

For Amicus Curiae:

Benjamin W. Hilley argued, Great Falls, Montana
D. Patrick McKittrick, Great Falls, Montana

---

Submitted: October 24, 1978

Decided: APR 1 1979

Filed: 1979

Thomas J. Kearney
Clerk

Mr. Justice John Conway Harrison delivered the Opinion of the Court.

Pursuant to the Montana Major Facility Siting Act, section 70-801 et seq., R.C.M. 1947, now section 75-20-101 et seq. MCA (hereinafter "Siting Act"), the Board of Natural Resources and Conservation (hereinafter "Board of Natural Resources"), on July 22, 1976, granted to the Montana Power Company, Puget Sound Power and Light Company, Portland General Electric Company, the Washington Water Power Company, and Pacific Power and Light Company (hereinafter "Utilities"), a certificate of environmental compatability and public need for the construction of the facility known as Colstrip Units 3 and 4. Respondents and cross-appellants appealed this decision to the First Judicial District Court, Lewis and Clark County, under the provisions of the Montana Administrative Procedure Act, section 82-4201 et seq., R.C.M. 1947, now section 2-4-101 et seq. MCA (hereinafter "MAPA"). The District Court reversed and remanded the matter to the Board of Natural Resources for rehearing. From this order both appellants/cross-respondents and respondents/cross-appellants appeal to this Court. The two appeals have been consolidated for hearing and decision.

To properly indicate the monumental proportions this matter has taken, we believe it is necessary to set forth its background in some detail as was done by the Board of Natural Resources in its findings of fact, conclusions of law, opinion, decision, order and recommendations. This also will help to illuminate the issues on appeal and place this controversy is perspective.

Pursuant to the terms of the Siting Act, on June 6, 1973, the Utilities filed with the Montana Department of

Natural Resources and Conservation (hereinafter "Department of Natural Resources") an application for a certificate of environmental compatibility and public need for the proposed Colstrip Units 3 and 4. Filed contemporaneously was a petition for waiver of time requirements as set forth in section 70-806, R.C.M. 1947, now section 75-20-211 MCA, and a filing fee of $1,232,930. The Utilities also filed with the Department of Natural Resources their environmental analysis of the proposed project and related facilities entitled "Colstrip Generation and Transmission Project." This environmental analysis was dated November 1973 and was prepared by the environmental systems department of Westinghouse Electric Corporation.

The Department of Natural Resources, pursuant to sections 70-807 and 70-816, R.C.M. 1947, now sections 75-20-216 and 75-20-503 MCA, of the Siting Act, conducted an extensive study over a period of 600 days of the application and issued its draft environmental impact statement in November 1974, recommending against the granting of the application. Subsequent to issuing the draft environmental impact statement, the Department of Natural Resources conducted a series of public meetings to gain input from the public regarding the proposed project and the analysis thereof contained in the draft environmental impact statement. On or about January 21, 1975, the Department of Natural Resources released its final environmental impact statement on the proposed project containing its recommendations against granting the application and transmitted the same to the Board of Natural Resources.

The Board of Natural Resources, on receipt of the recommendations from the Department of Natural Resources and

after due and deliberate consideration, issued an order dated January 24, 1975. In its order the Board of Natural Resources deemed that the matter before it, i.e., the application for a certificate of environmental compatibility and public need for the proposed Colstrip Units 3 and 4, would be considered a contested case as defined in MAPA, section 82-4201 et seq., R.C.M. 1947, now section 2-4-101 et seq. MCA. Subsequent to issuing this order, the Board of Natural Resources issued orders on February 7, 1975 and February 14, 1975, pertaining to matters of procedure to be followed, particularly referring to the methods of discovery and determining the burden of proof.

The Board of Natural Resources further ordered that the hearing would commence on March 10, 1975, at Bozeman, Montana. Notice of the time and place of the hearing was given to all parties and published in daily newspapers throughout Montana to inform the public. On March 10, 1975, the hearing began, at which time motions were presented to the Board of Natural Resources by the opponents of the application to continue the hearing until May 13, 1975, to afford the parties time to complete discovery procedures. Also, objections were made to a member of the Board of Natural Resources serving as hearings examiner. On April 17, 1975, the Board of Natural Resources continued the hearing until April 21, 1975, and on April 10, 1975, Carl M. Davis was appointed by the Board as hearings examiner to preside over the public hearing phase of the proceedings.

Following a pretrial conference with the parties, the hearings examiner, by order dated April 15, 1975, directed the proceedings to reconvene on April 21, 1975, at Helena, Montana.

By letter dated April 10, 1975, the director of the Department of Health and Environmental Sciences (hereinafter "Department of Health") notified the Board of Natural Resources that the Department of Health certified that the proposed facility will not violate state and federally established water quality standards. It did not certify that the proposed facility will not violate state and federally established air quality standards and implementation plans.

On April 18, 1975, the Northern Plains Resource Council filed Cause No. 38934 in the District Court of Lewis and Clark County. A writ of prohibition was served upon the Board of Natural Resources and the hearings examiner, directing them to desist and refrain from any further proceedings until further order of the court and further directed them to appear in court on April 22, 1975. Following the hearing the court, on April 29, 1975, quashed the writ of prohibition, thereby allowing the hearing to continue. The court further ordered the Board of Health and Environmental Sciences (hereinafter "Board of Health") to hold a hearing to determine whether the certificate required by section 70-810(1)(h), R.C.M. 1947, now section 75-20-301(1)(h) MCA, should be issued.

The hearing was reconvened in Helena on May 5, 1975. Motions by the opponents for further continuances were presented and granted by the hearings examiner, continuing the hearings until May 20, 1975.

On May 9, 1975, the Northern Cheyenne Tribe, Inc., filed an application for a writ of prohibition in the District Court of Lewis and Clark County, Cause No. 39000. This matter was heard by the court on May 19, 1975, and

judgment was entered on the same date dismissing the application.

The public hearing before the Board of Natural Resources formally began on May 20, 1975, and continued until June 5, 1975, at which time the hearing before the Board of Health was commenced with Carl M. Davis serving as hearings examiner. The hearing before the Board of Health consumed a total of 53 hearing days and concluded on September 15, 1975 with 53 witnesses having testified. After studying the testimony and exhibits, and the findings of fact submitted by the parties, the Board of Health heard oral arguments by counsel, visited the site of the proposed facilities and rendered its decision on November 21, 1975, issuing its conditional certification, pursuant to section 70-810(1)(h), R.C.M. 1947, now section 75-20-301(1)(h) MCA, of the Siting Act.

On July 23, 1975, at the conclusion of Utilities' case-in-chief in the Board of Health hearing, the opponents to the application moved to dismiss the Utilities' proceedings for certification, together with a motion to continue further hearings until the Board of Health ruled upon the motions. The motion to continue the Board of Health hearing was denied on July 24, 1975. The opponents to the application filed in the District Court of the First Judicial District, Cause No. 39228, an application for a writ of prohibition or mandate commanding the Board of Health and the hearings examiner to cease and refrain from further proceedings until further order of the court or to show cause to the court why the Board of Health should not be permanently restrained from further proceedings until the Board had ruled upon opponents' motion to dismiss.

On July 25, 1975, this Court granted the Utilities' application for a writ of supervisory control and directed the District Court to either withdraw its writ of prohibition or, in the alternative, to appear before the Supreme Court on July 28, 1975. On July 28, 1975, this Court heard the matter, and at the conclusion of the hearing directed that the writ of prohibition be set aside and that the hearings proceed.

The hearings examiner for the Board of Natural Resources issued an order dated December 10, 1975, recovening the Board of Natural Resources' hearing on January 19, 1976, at Helena. In addition he set forth certain procedures to be followed by all parties to the proceedings regarding the presentation of direct testimony and cross-examination. Notice of the time and place of the hearing was served on all parties and published in daily newspapers throughout the state to inform the public. The Department of Natural Resources and the Northern Plains Resource Council filed motions with the Board of Natural Resources, moving the Board to terminate its hearing on the basis that the Board of Health had not certified, or had miscertified, that the proposed Colstrip Units 3 and 4 would meet applicable air and water quality standards. After a hearing, the motion was denied.

The reconvened hearing commenced on January 19, 1976, and was concluded on March 30, 1976. A total of 255 witnesses testified, including 132 public witnesses. The transcript of the proceedings in both the Board of Health hearing and the Board of Natural Resources hearing, consisting of approximately 17,000 pages, including copies of the exhibits received into evidence, were served upon each

member of the Board of Natural Resources together with the parties' proposed findings of fact.

The Board of Natural Resources visited and inspected the proposed facilities on two occasions. After due and timely notice being served and published, it heard oral arguments on May 19 and 20, 1976, by all parties who were present and desired to present arguments.

The Board of Natural Resources having inspected the site, read the record of the proceedings and the proposed findings of fact of the parties, and heard the arguments of counsel and public parties, and having duly considered the same and being fully advised in the premises, announced in a regularly scheduled and noticed meeting on June 24, 1976, that it was ready to act upon the application. A motion to approve the application to construct Colstrip Units 3 and 4 and associated facilities and to grant applicants a certificate of environmental compatibility and public need, subject to certain stated conditions, was seconded and carried with four members voting in favor of the motion and three members voting against the motion.

A majority of the Board having approved granting the application, the Board made its findings of fact and conclusions of law, together with its decision, opinion, order and recommendations. It granted the certificate of environmental compatibility and public need to the Utilities on July 22, 1976.

Respondents/cross-appellants appealed to the District Court of Lewis and Clark County, which reversed and remanded the matter to the Board of Natural Resources. Appeal to this Court from the District Court's opinion is taken by all parties.

Before discussing the many individual issues in this case, there are several other matters which require emphasis by this Court.

Section 82-4216(7), R.C.M. 1947, now section 2-4-704 MCA, enacted in 1971 as a part of MAPA, establishes the standards of judicial review of contested agency decisions. The foregoing subsection commences by stating that the court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. It continues by providing that the court may reverse or modify the agency decision if substantial rights of the appealing party have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (a) in violation of constitutional or statutory provisions; (b) in excess of the statutory authority of the agency; (c) made upon unlawful procedure; (d) affected by other error of law; (e) clearly erroneous in view of the reliable, probative and substantial evidence on the whole record; (f) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or (g) because findings of fact, upon issues essential to the decision, were not made although requested. It is clear from this statute that the burden resting upon an appealing party to a District Court from an agency decision is a substantial one.

This Court recently set forth three basic principles underlying section 82-4216 which a District Court must consider in determining what the scope of review of an administrative decision should be: (1) that limited judicial review of administrative decisions strengthens the administrative process by encouraging the full presentation of evidence at the initial administrative hearing; (2)

judicial economy requires court recognition of the expertise of administrative agencies in the field of their responsibility; and (3) limited judicial review is necessary to determine that a fair procedure was used, that questions of law were properly decided, and that the decision of the administrative body was supported by substantial evidence. Vita-Rich Dairy, Inc. v. Department of Business Regulation (1976), 170 Mont. 341, 553 P.2d 980.

A recent United States Supreme Court decision has a great deal to say on the subject of judicial review of agency decisions. The Court expresses its views on the practice of some federal judges in placing themselves in the place of the agency in making the decision, rather than following the correct course and setting aside agency decisions only for substantial procedural or substantive reasons as mandated by statute. In Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc. (1978), 435 U.S. 519, 98 S.Ct. 1197, 55 L Ed 2d 460, the Supreme Court unanimously reversed a decision of the Court of Appeals for the District of Columbia Circuit which had overturned the Atomic Energy Commission's decision to grant Vermont Yankee a license to operate a nuclear power plant.

The Court of Appeals ruled that the rule-making procedures of the AEC were inadequate despite the fact that the agency had employed all the procedures required by the Federal Administrative Procedure Act and more. The Supreme Court concluded that the Court of Appeals had seriously misapplied statutory and decisional law cautioning reviewing courts against engrafting their own notions of proper procedures upon agencies entrusted with substantive functions by Congress, 435 U.S. at 525, and that "[a]bsent constitu-

tional constraints or extremely compelling circumstances the 'administrative agencies "should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."' . . ." Vermont Yankee, 435 U.S. at 543.

In cautioning the lower court to judge an agency decision by the appropriate standards of review, the Supreme Court noted that the lower court should "not stray beyond the judicial province to explore the procedural format or to impose upon the agency its own notion of which procedures are 'best' or most likely to further some vague, undefined public good." 435 U.S. at 549. The court left little doubt in stating:

> ". . . the role of a court in reviewing the sufficiency of an agency's consideration of environmental factors is a limited one, limited both by the time at which the decision was made and by the statute mandating review.
>
> "'Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions.' [Citation omitted.]" Vermont Yankee, 435 U.S. at 555. (Emphasis supplied.)

As to nuclear energy, the Court pointed out that Congress had made a choice to at least try nuclear energy, establishing a reasonable review process in which courts are to play only a limited role. ". . .The fundamental policy questions appropriately resolved in Congress and in the state legislatures are not subject to reexamination in the federal courts under the guise of judicial review of agency action. . ." 435 U.S. at 558. The Court concluded with the strong language:

> ". . . It is to insure a fully informed and well-considered decision, not necessarily a decision the judges of the Court of Appeals or of this Court would have reached had they been

members of the decisionmaking unit of the agency. Administrative decisions should be set aside in this context, as in every other, only for substantial procedural or substantive reasons as mandated by statute, Consolo v. FMC, 383 U.S. 607, 620 (1966), not simply because the court is unhappy with the result reached . . . ." 435 U.S. at 558.

Because so many of the issues in this case involve the findings of at least one board below, we review briefly what this Court has stated regarding the rules of construction applied to findings of fact. In Ballenger v. Tillman (1958), 133 Mont. 369, 324 P.2d 1045, this Court stated that ultimate facts, as distinguished from evidentiary ones, are the findings a trial court should make. Findings are to receive such a construction as will uphold, rather than defeat, the judgment. This Court quoted with approval a California case to the effect that there is no error in the failure of a trial court to make an express finding upon an issue if it was implicit in the findings made, and that there is no necessity to negate contradictory allegations.

Ballenger was quoted with approval in Erickson v. Fisher (1976), 170 Mont. 491, 554 P.2d 1336, where the Court rejected a proposed finding of fact offered by the appellant because it was merely an evidentiary fact as distinguished from an ultimate fact.

It has been stated another way that findings are sufficient if they dispose of material issues. 76 Am Jur 2d, Trial, §1259; 89 C.J.S. Trial, §626. This is applicable to court trials, and it is obvious that stricter rules should not be imposed upon administrative agencies.

This record contains some 17,000 pages of transcript; hundreds of exhibits, including a monumental "environmental analysis"; and hundreds of proposed findings of fact and

conclusions of law. The findings of fact and conclusions of law of the Board of Health are 23 pages long, and those of the Board of Natural Resources run 46 pages. Approximately 300 pages of briefs were submitted. Many of the questions involved require first impression decisions as to the requirements of the MAPA and of the Siting Act.

Due to the many issues presented, their complexity, and the voluminous pages of transcript, we find it impractical to set forth the entire statement of facts in a single portion of this opinion. Further necessary and appropriate facts will be discussed with each issue.

The issues presented to this Court, as agreed to by the parties and addressed by the District Court, are:

1. Whether the District Court's ruling that prohibition of cross-examination of agency witnesses violated constitutional standards, statutes, and regulations, was error?

2. Whether the Board of Health proceedings, record, transcript, exhibits, findings, conclusions and orders in the Board of Natural Resources record is subject to review?

3. Whether the District Court erred in requiring the Board of Health to consider state or federal implementation plans in reaching certification pursuant to section 70-810(1)(h), R.C.M. 1947, now section 75-20-301(1)(h) MCA?

4. Whether the District Court erred in requiring the Board of Health to make findings and conclusions as to whether certain air and water quality standards would be complied with, and whether the facilities would have a major impact on ground water quality?

5. Whether the District Court erred in requiring the Board of Natural Resources to consider and make adequate

findings of fact and conclusions of law with respect to whether the facilities will result in the minimum adverse environmental impact?

6. Whether the District Court's ruling that the Board of Health is required to certify without condition, compliance with air and water quality standards and state implementation plans, was error?

7. Whether the District Court properly ruled that the Board of Natural Resources be required to consider and make adequate findings as to the siting and location of the transmission corridor for the 430 miles of transmission lines?

8. Whether the District Court erred in holding that there was not substantial credible evidence to support the Board of Natural Resources' findings, conclusions, and decision that the proposed facility represents the minimum adverse environmental impact?

9. Whether the District Court properly accepted and ruled that parties to the petition were adequately served?

10. Whether the Board of Natural Resources properly denied a motion to deny the application based on the Board of Health's miscertification or noncertification of the air and water quality matters required under section 70-810(1)(h), R.C.M. 1947, now section 75-20-301(1)(h) MCA?

11. Whether the Board of Natural Resources' refusal to consider the minimum adverse environmental impact as to requiring more efficient technology for the removal of $SO_2$ and the District Court's opinion affirming that refusal is error under the Siting Act?

12. Whether the refusal of the Board of Natural Resources to allow its members the opportunity to review

findings of fact and conclusions of law prior to adoption, and the District Court's affirming that decision, was arbitrary and capricious on the part of the agency and a deprivation of petitioners' constitutional rights to due process and a full and fair hearing before the Board?

The first issue to be addressed is Issue No. 9--whether the District Court properly accepted and ruled that parties to the petition were adequately served. We believe that it did. While the District Court did not make a specific ruling as to the effectuation of proper service on all parties, it surely is clearly implied by its various pre-trial orders and by its final order reversing and remanding.

Surely neither the Utilities nor the agency appellants/cross-respondents have any standing to complain about service in this matter. Any complaint they might have had was waived by agreeing to the delineation of issues which were finalized by the District Court's order of February 27, 1977. It is contended by the Union and REA, appellants/cross-respondents, that they are each "parties of record" for the purposes of section 82-4216(2)(a), R.C.M. 1947, now section 2-4-702 MCA, of the MAPA, and thereby entitled to individual service of a copy of the petition of review. We find that the Union and REA were not indispensable parties under the circumstances entitled to individual service of a copy of the petition of review. Compare, Cissell v. Colorado State Bd. of Assessment App. (Colo. 1977), 564 P.2d 124, and Life of the Land v. Land Use Comn. (1977), 58 Haw. 292, 568 P.2d 1189. They were jointly represented by counsel and the International Brotherhood of Electrical Workers, an active participant in the agency proceeding was actually served

with a copy of the petition for review. Had these appellants/cross-respondents communicated with one another, they would have had actual knowledge of the petition, if they did not have such knowledge from their counsel or the newspapers.

We do not feel that judicial review of the Board's action should be thwarted by a party not participating in a proceeding, even though it had knowledge of it, and later allowed to complain that the court had no jurisdiction over the matter. The motion of the Union and REA to dismiss this proceeding is hereby denied.

Issue No. 2 will be considered next. This issue could more properly be phrased by asking whether the decision of the Board of Health was a final decision under the provisions of section 82-4216, R.C.M. 1947, now section 2-4-702 MCA, of the MAPA, and, if so, whether an appeal of such order is mandatory or permissive.

On pages 16 and 17 of its order, the District Court held that the granting of the Board of Health certification should properly be viewed as a "preliminary, procedural or intermediate agency action" which is not reviewable because review of the final agency action (i.e., that of the Board of Natural Resources) provides not only an adequate remedy but the only necessary remedy." The District Court held that the Board of Health certification had no legal effect whatsoever until and unless the Board of Natural Resources granted its certification under section 70-804, R.C.M. 1947, now sections 75-20-201 and 75-20-203 MCA. The court concluded that the Board of Health decision could not be appealed until the Board of Natural Resources granted a final certificate of environmental compatibility.

-16-

Section 82-4216, R.C.M. 1947, now section 2-4-702 MCA, provides:

"(1)(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision in a contested case is entitled to judicial review under this part. This section does not limit utilization of or the scope of judicial review available under other means of review, redress, relief, or trial de novo provided by statute. A preliminary, procedural, or intermediate agency action or ruling is immediately reviewable if review of the final agency decision would not provide an adequate remedy."

The issue then is whether or not the decision of the Board of Health dated November 21, 1975, certifying that Colstrip Units 3 and 4 would not violate state and federally established standards and implementation plans, was a final decision under the provisions of the MAPA and, accordingly, should have been appealed to the District Court by the petitioners at that time.

Section 70-810(1)(h), R.C.M. 1947, now section 75-20-301(1)(h) MCA, provides that the Board of Natural Resources may not grant a certificate until it determines that the authorized state air and water quality agencies have certified that the proposed facility will not violate state and federally established standards and implementation plans. There is no question that the Board of Health is the duly authorized state air and water quality agency in this case.

Section 70-810, R.C.M. 1947, now section 75-20-301 MCA, further provides that judgments of the authorized air and water quality agencies "are conclusive" on all questions relating to the satisfaction of state and federal air and water quality standards. The Board of Natural Resources had no authority to review the decision of the Board of Health under any circumstances. Accordingly, the Board of Health

-17-

order was not a preliminary or interlocutory order. It was final for all purposes. Thus, an appeal should have been made by petitioners at that time.

The fact that the Board of Health's certification was not the final order in point of time in the proceedings is not conclusive on the question of appealability. ". . . For purposes of judicial review the finality of an agency order depends upon the nature of the order rather than its chronology in relation to the whole of the agency proceedings. . ." Goodman v. Public Service Commission, (D.C. Cir. 1972), 467 F.2d 375, 377, citing Federal Power Comm'n v. Metropolitan Edison Co. (1938), 304 U.S. 375, 384, 58 S.Ct. 963, 82 L.ed. 1408.

Goodman involved a hearing before the Washington, D.C. Public Service Commission concerning a petition for a rate increase. The hearing was bifurcated into two "phases." In its Phase I order, the PSC established the fair rate of return at 7.1 percent. The Power Company was then ordered to submit proposed schedules to increase its revenue accordingly. The PSC Phase II order was an order effectuating the above directive by approving a schedule of rates. Goodman appealed from the Phase I order and not the Phase II order. The federal district court dismissed the appeal holding that the Phase I order was not a final order or decision and that Goodman was not affected until entry of the Phase II order. The Circuit Court of Appeals reversed, holding that the Phase I order was a final order:

> ". . . Its final character is in no sense
> affected by the need for the later Phase II
> order allocating the increase among the several
> different categories of customers. The in-
> crease in rates, and the findings of the Com-
> mission upon the basis of which the increase

was allowed, were in no way left for further decision by the Phase II order.

". . .

"While it is true that in our case there was something else for the Commission to do, the validity of the over-all increase [Phase I] was not conditioned upon anything yet to be resolved by the later order authorizing tariff schedules. What remained to be done was not concerned with the validity of the increase in rates which had been granted--the action of the Commission which Mr. Goodman took to court. That action 'was expected to and did have legal consequences' which were not modified nor intended to be modified by the Phase II order which followed. [Citing cases.]" Goodman, 467 F.2d at 377-78.

As with the PSC Phase I order in Goodman, the Board of Health's certification was not conditioned upon anything yet to be resolved by the later order of the Board of Natural Resources. The remaining administrative procedures were not concerned with air and water quality certification. The Board of Health order in this regard was final and conclusive. The Board of Health's action "was expected to and did have legal consequences" which were neither modified nor intended to be modified by the later order of the Board of Natural Resources. The Board of Health's order of November 21, 1975, marks the consummation of the administrative process within that particular agency. The Board of Health's decision was final for purposes of judicial review and should have been appealed at that time.

"The principle of finality in administrative law is not, however, governed by the administrative agency's characterization of its action, but rather by a realistic assessment of the nature and effect of the order sought to be reviewed. Hence, 'a final order need not necessarily be the very last order' in an agency proceeding, but rather, is final for purposes of judicial review when it 'impose[s] an obligation, den[ies] a right, or fix[es] some legal relationship as a consummation of the administrative process.' . . ." Fidelity Television, Inc. v. F.C.C. (D.C. Cir. 1974), 502 F.2d 443, 448.

We find that the Board of Health's order of November 21, 1975, was final on that date. An appeal from that order had to be filed within thirty days thereafter pursuant to the terms of the MAPA. No appeal was timely filed and, therefore, the District Court was without jurisdiction to review the order. The District Court is reversed accordingly.

In view of the fact that this Court has ruled that the District Court was without jurisdiction to review the Board of Health's order dated November 21, 1975, the following issues become moot and need not nor can be decided by us: Issue No. 3 involving the alleged failure of the Board of Health to consider state and federal implementation plans; Issue No. 4 concerning the requirement that the Board of Health make additional findings and conclusions concerning certain air and water standards; and Issue No. 6 which raised the question of the validity of the conditional certificate issued by the Board of Health.

Issue Nos. 10, 11 and 12 involve issues wherein respondents/cross-appellants contend the District Court erred.

Issue No. 10 questions the denial by the Board of Natural Resources and the concurrence of the District Court of respondents/cross-appellants' motion to deny the application because of faulty certification by the Board of Health. We find that the District Court properly concurred in the denial of the motion.

On January 7 and 8, 1976, respondents/cross-apellants filed motions to terminate the proceedings before the Board of Natural Resources on the grounds of the alleged invalidity of the certification of the facility by the Board of Health. The Board of Natural Resources denied the motions.

Under the provisions of section 70-810(1)(h), R.C.M. 1947, now section 70-20-301(1)(h) MCA, of the Siting Act, the Board of Health is required to certify to the Board of Natural Resources ". . . that the proposed facility will not violate state and federally established standards and implementation plans . . ." This was done by the Board of Health on November 21, 1975. The grant was called a "conditional certificate," but that qualification has no significance for the purposes of this issue. The above section of the Siting Act provides further that the judgments of the Board of Health ". . . are _conclusive_ on all questions related to the satisfaction of state and federal air and water quality standards." (Emphasis added.) Therefore, from a statutory standpoint alone, the Board of Natural Resources had no choice but to look upon the certification by the Board of Health as "conclusive" and deny the motions of respondents/ cross-appellants.

There is an even more compelling reason why the Board of Natural Resources was justified in denying the motions. The certification and order of the Board of Health was dated November 21, 1975. We held under Issue No. 2 that such certification and order was a "final decision in a contested case" and subject to mandatory judicial review within thirty days after its issue. The motions of respondents/cross-appellants were not filed until January 7 and 8, 1976, well beyond the thirty-day period for judicial review, thus making the certification and order of the Board of Health doubly "conclusive" not only upon the Board of Natural Resources but also upon the District Court. The remedy available to respondents/cross-appellants on this issue of certification by the Board of Health was to institute judicial review within the statutory thirty-day period.

Issue No. 11 concerns the District Court's upholding the refusal of the Board of Natural Resources to require more efficient technology for the removal of $SO_2$ at the facility in considering minimum adverse environmental impact. This issue solely involves questions of fact thoroughly reviewed by the Board of Natural Resources before making its findings, conclusions and orders. In their briefs both appellants/cross-respondents and respondents/cross-appellants argue about highly technical matters, which more properly should be presented before the administrative agencies. We believe the District Court decided the matter properly, and its reasons were adequately stated at pages 34 and 35 of its opinion:

> ". . . The disagreement seems to arise over the assertion by applicants that BACT can be equated to the highest state of the art or to minimum adverse environmental impact. Petitioners insist the latter sets a higher standard that BACT and that the evidence here shows the pollution removal equipment proposed does not meet that standard. In my opinion, the BACT, or NSPS and PSD, standards are empirical and quantifiable and are set out specifically in the EPA regulations. These should be determined by the Department of Health, as that department attempted to do here. On the other hand, the determination as to whether various aspects of the proposed facility will provide minimum adverse environmental impact (or represent the highest state of the art) is a judgmental matter, requiring comparison, the weighing of several factors and the balancing of pros and cons. This is the business of the Board of Natural Resources. (In this case, Finding of Fact #79 of the Board of Natural Resources sets forth some, or all of the factors considered.) Here the petitioners argue that the evidence provided by the witness Brink shows clearly that the highest state of the art would provide 90% removal of $SO_2$. The applicant points out that Brink's technology applies to a high sulfur coal installation with an open loop settling system. The proposed facility takes advantage of low sulphur coal and a closed loop system that would 'trade off' higher sulfur emission (purportedly within NSPS and PSO standards) for minimization of water pollution. Thus, the type of pollution control equipment proposed by the applicants

-22-

approved by the Board of Natural Resources may contribute to a <u>total</u> <u>system</u> that provides minimum adverse environmental impact. Such an express conclusion as applied to the pollution control equipment would have been helpful; but it can be fairly implied from the findings of both Boards. It can certainly be deemed to come under the all-encompassing statement in Finding of Fact #3 and Conclusion of Law #4 of the BNR certification. It seems to me the conclusion on this particular aspect of the case has been adequately stated and that it is not 'clearly erroneous', although it would have benefited from more substantial factual findings to support it."

The District Court's holding on this issue was not in error.

Issue No. 12 raises the point as to whether the refusal by the Board of Natural Resources to allow members to review findings and conclusions prior to adoption was a deprivation of respondents/cross-appellants' rights to due process and a full and fair hearing before the Board of Natural Resources. We find no such deprivation.

A review of the District Court opinion indicates that it actually did not make any ruling on this point. And, a review of the record also indicates that respondents/cross-appellants did not raise this issue in the District Court. Therefore, it cannot be raised for the first time on appeal to this Court. We have repeatedly held that we will not consider questions of claimed error not previously raised or presented to the trial court. Hayes v. J.M.S. Const. (1978), ___ Mont. ___, 579 P.2d 1225, 35 St.Rep. 722; Mont. Ass'n of Underwriters v. State, Etc. (1977), ___ Mont. ___, 563 P.2d 577, 34 St.Rep. 297; Kearns v. McIntyre Const. Co. (1977), ___ Mont. ___, 567 P.2d 433, 34 St.Rep. 703.

We point out, however, that in our opinion there was no deprivation of rights or even unfair practices in the adoption of findings and conclusions by the Board of Natural

Resources. A reading of the entire separate volume of transcript regarding procedural matters before the Board of Natural Resources dated July 22, 1976, clearly demonstrates this.

The record indicates that prior to the meeting of the Board of Natural Resources in June 1976, each board member prepared his own set of findings and conclusions, after which a vote was taken at the June 1976 meeting "as to which route they would choose." Following the vote, the hearings examiner was requested by the Board to prepare findings of the majority, which had voted to approve the application. On July 8, 1976, two weeks prior to the final meeting of July 22, 1976, a letter was sent to each board member with a copy of the hearings examiner's proposed findings of fact, conclusions of law, opinion, decision, order and recommendations. The hearings examiner requested that he be notified of any changes any member wanted made. The hearings examiner noted that there were some changes to be made such as spelling and typographical errors, and some provisions were changed. These findings and conclusions were adopted by the Board of Natural Resources simultaneously with the granting of the certificate of environmental compatibility and public need. Under these circumstances the Board of Natural Resources' action could not be held to be arbitrary and capricious, or a deprivation of respondents/ cross-appellants' constitutional rights to due process and a full and fair hearing.

Issue No. 5 involves the District Court's requirement that the Board of Natural Resources make additional findings and conclusions regarding the use of Rosebud coal versus McKay coal and the mine-mouth versus load-center generation

question. The District Court admits there was ample testimony on both points but insists the statutory findings and conclusions that the facilities will meet the "minimum adverse environmental impact" test of the Siting Act, as required by section 70-810(1)(c), R.C.M. 1947, now section 75-20-301(2)(c) MCA, must be accompanied by a "precise and explicit statement of the underlying facts supporting the findings" as provided under the terms of the MAPA, section 82-4213, R.C.M. 1947, now section 2-4-623 MCA. We agree.

In connection with the Rosebud versus McKay coal point in this issue, the District Court held that the Board of Natural Resources did not make adequate findings of fact and conclusions of law regarding whether the use of only Rosebud coal, without the use of any McKay coal, represented the minimum environmental impact. The testimony indicates there are extensive McKay coal deposits in the same area as the Rosebud coal deposits. The use of one coal seam to the exclusion of the other could, of course, result in an increased effect of the impact of strip mining and reclamation.

The lack of any specific findings in this disputed factual area, directly affecting the environmental impact of the facility, was error on the part of the Board of Natural Resources. The District Court properly held that a concise and explicit statement of the underlying findings of fact was necessary to support the ultimate conclusion.

Regarding the second point in this issue, the District Court held that the Board of Natural Resources be required to make adequate findings of fact and conclusions of law with regard to:

"(b) Whether mine-mouth generation as opposed to load center generation represents minimum environmental impact, and the reasons therefor, including considerations as to relative energy efficiency and the relative impact of electrical transmission versus coal haulage, both as required by Section 70-810(1)(c)."

Appellants/cross-respondents maintain that only ultimate factual conclusions need be drawn by the Board of Natural Resources and underlying supporting findings of fact are not required. Such a position is contrary to the requirements of MAPA. Section 82-4213, R.C.M. 1947, now section 2-4-623 MCA.

The issue is primarily one of whether clear-cut alternatives in the evidence need be considered in the findings by the Board of Natural Resources in reaching the statutory conclusion that the facilities will meet the minimum adverse environmental impact. The Board of Natural Resources made no findings, for example, as to whether the economic detriment, if any, in terms of depreciated land values and effect on business and commerce, caused by the taking of 430 miles of double right-of-way across the State of Montana versus the utilization of existing railroad right-of-way satisfied the minimum impact test.

The District Court ruling that the Board of Natural Resources be required to make findings as to the "nature and economics of the various alternatives," as set forth in section 70-810(1)(c), R.C.M. 1947, now section 75-20-301(2)(c) MCA, was proper and in accordance with applicable law.

Issue No. 7 questions the District Court's requirement that the Board of Natural Resources make additional findings as to the siting and the location of the transmission line corridor.

The District Court held that the Board of Natural Resources made inadequate findings as to the environmental

criteria and the identification and designation of the transmission line corridor as required by the MAPA in section 82-4313, R.C.M. 1947, now section 2-4-623 MCA.

The transmission line, as a part of the facilities, calls for the location of approximately 430 miles of right-of-way for two 500 k.v. transmission lines from Colstrip to the western boundary of the state.

The District Court held that the Board of Natural Resources was required to "clearly designate a transmission line corridor, make findings of fact as to why the Board preferred the chosen corridor to the alternative corridors, and conclusions of law as to what state and local legal requirements must be met, and whether they have in fact been met, in accordance with Section 70-810(1)(f)." We concur.

Appellants/cross-respondents point out the apparent inconsistency of the District Court's opinion wherein the court refused to consider the lack of findings as to the environmental impact of the alternative corridor segments, and its final ruling set forth above. Although the opinion could be clearer in this regard, it is apparent that the District Court rejected respondents/cross-appellants' argument on the issue of minimum adverse environmental impact as to the alternative corridors. However, the District Court refused to affirm the granting of a certificate by the Board of Natural Resources, without some actual identification of the corridors subject to approval.

With respect to the transmission facilities, appellants/cross-respondents' Exhibit 92 sets forth a number of alternative segments which, in combination, could make up possibly five or six different routings, rather than 54 alternative routes as suggested by appellants/cross-respondents. Also,

respondents/cross-appellants submitted proposed findings on the preferability of alternative corridors, particularly the use of existing railroad right of way over the routes --- proposed by appellants/cross-respondents. BNR Proposed Findings N.P.R.C. #13-16, 32, 34-36, 66-69, 104-105, 108, 115. DNRC #814-820.

The findings of fact touching on this issue were conclusory in nature and presented no basis or underlying supporting facts for the conclusion reached. See Board of Natural Resources Finding of Fact No. 48. Furthermore, in a subsequent finding, No. 74, the Board of Natural Resources found that further meteorological data was necessary for a determination of a <u>final</u> <u>selection</u> <u>of</u> <u>the</u> "<u>proposed</u> <u>corridor</u>." (Emphasis supplied.) The conclusions of law go no further than to make a reference in one of the conditions to a "proposed corridor." Board of Natural Resources Conclusion of Law No. 12 (L)(3).

As stated by the District Court, the pertinent findings of fact and conclusions of law with respect to the transmission facilities are totally conclusory in nature with respect to their location. Furthermore, they fail to actually reach the conclusion that a transmission route has been located. This is, of course, the fundamental purpose of the entire agency process. Section 82-4213, R.C.M. 1947, now section 2-4-623 MCA, provides in part: ". . . Each conclusion of law shall be supported by authority or by a reasoned opinion."

Appellants/cross-respondents allude to citations of the record to satisfy the essential fact-finding obligation of the Board of Natural Resources with respect to the requirement that the location conform to state and local laws and regulations (section 70-810(1)(f), R.C.M. 1947, now section

-28-

75-20-301(2)(b) MCA). The District Court correctly held that the identification of the laws determined to be complied with was necessary to support Conclusion of Law No. 8. The District Court in this instance could not substitute its judgment for the agency in the absence of any definitive decision by the agency.

Appellants/cross-respondents' contention that references in the findings to the fact that the transmission lines would be located to avoid population centers as much as possible, without even a consideration of what population centers were involved, the effect of the impact, or the corresponding benefits, if any, does not satisfy the fact-finding obligation of the Board of Natural Resources.

Finally, subsequent approval of a segment of centerline has no bearing on the validity of the Board of Natural Resources with respect to location of a corridor. The fact that members of the Board of Natural Resources may subsequently identify a centerline location does not aid the incompleteness of the Board of Natural Resources' determination with regard to a corridor location.

The District Court properly found that something more than conclusory findings of fact or conclusions of law was necessary to meet the requirements of the Siting Act with respect to location of transmission line facilities, especially of the magnitude sought by appellants/cross-respondents.

We now turn to Issue No. 8 concerning the District Court's finding as to whether there was substantial credible evidence to support the Board of Natural Resources' findings, conclusions and decision that the proposed facility represents the minimum adverse environmental impact.

The parties in this matter phrased this issue as to whether the District Court erred in holding there was not substantial evidence to support a finding of minimum adverse environmental impact. A careful reading of the District Court opinion indicates that such a statement of the issue is not correct. The District Court in its decision on this issue set forth nine different headings. The District Court on all the headings except possibly number 8 ruled in favor of the utilities. It found there was substantial credible evidence to support the Board of Natural Resources' findings, conclusions and decision that the proposed facility represents the minimum adverse environmental impact. Concerning number 8 the District Court held there is substantial evidence but then beclouds the issue by adding, almost parenthetically, that the Board of Natural Resources did not support its ultimate conclusion with any findings as to underlying facts. We find that the language concerning supporting ultimate facts is surplusage as far as this issue is concerned. We agree with the District Court and find that there is substantial credible evidence in the record to support the Board of Natural Resources' findings, conclusions and decision that the proposed facility represents the minimum adverse environmental impact.

The final issue for this Court to decide and probably the most far-reaching with regard to administrative law in this state, is Issue No. 1--whether the District Court erred in holding that the Board of Natural Resources must provide respondents/cross-appellants the opportunity to cross-examine witnesses of the Department of Health and the Department of Natural Resources in the hearings before each Board.

The District Court in its decision and order held that the hearings examiner erred in ruling that parties opposing the utilities' application could not cross-examine witnesses called by other party opponents in both the Board of Health and Board of Natural Resources hearings. We disagree. To fully comprehend the nature and reason for the ruling, we examine the background of the proceedings prior to the ruling.

After reading the record and the briefs in this case, the position of the main parties in the two hearings becomes obvious early. On the one side were the proponents consisting of the utilities as applicants. On the other side were the opponents to the application consisting of Northern Plains Resource Council, Northern Cheyenne Tribe, Inc., the Department of Natural Resources and the Department of Health. Each of the above opponents was represented by separate counsel. With interest we note that when it came time to submit to the Board of Health proposed findings of fact and conclusions of law, as well as comments on the utilities' proposed findings of fact and conclusions of law and final memoranda, the four main opponents submitted joint pleadings--not separate ones, each pleading being signed by the four separate counsel representing each main opponent. In fact, the title of each pleading designates the four parties as "opponents" to the application. Any attempt to cast doubt upon the division of parties into distinct proponents and opponents, as the District Court attempted to do in its opinion and order of March 3, 1978, is without merit.

No one involved in the proceedings expected an early conclusion, yet it soon became apparent that the proceedings could last for months unless steps were taken to shorten the

hearings. For example, the first witnesses called averaged over five days of testimony each, including extensive cross-examination by attorneys for the four main opponents to the application. Extended discussions among the attorneys and the hearings examiner ensued in an effort to break the impasse.

The apprehension of the hearings examiner became more noticeable as the proceedings progressed. Thus, early in the hearings he noted that the Board of Health proceedings were in the second week and the second witness was still on the stand. At the beginning of the second month of hearings, four witnesses had not yet been completed.

Finally, the hearings examiner ruled that all witnesses would thereafter present their testimony in writing, and that the opponents to any witness would have six hours of cross-examination time, divided among them as they might agree. The hearings examiner further reserved the right to permit additional cross-examination if it was material and if without it prejudice might occur. A limitation was also placed upon redirect and recross examinations.

Approximately a month later, and after the utilities had rested their case-in-chief, objections were made by the opponents to not being allowed to cross-examine witnesses called by other opponents. At that time, the hearings examiner ruled that no party opposing the application would be allowed to cross-examine witnesses presented by any other party opponent. However, there was at least one exception to the rule expressed at the time, and followed thereafter, in that counsel for Northern Plains Resource Council was allowed to cross-examine Department of Health witnesses as to the water aspects of the case because the Department had

indicated that it could certify that the project would meet all applicable state and federal water standards. With this position, Northern Plains did not agree.

The comments of the hearings examiner on this subject are most illuminating, including his comments as to who opposed the application. In response to a question as to whether or not the chair had ruled that the Northern Plains Resource Council could not cross-examine a Department of Natural Resources' witness, the hearings examiner stated:

> "HEARINGS EXAMINER: That's correct, except on matters pertaining to water. It's my understanding at the outset of this thing, we line up on two sides, proponents and opponents. Now, there was some conversation that you weren't lined up that way, but the chair, the Hearings Examiner, has observed throughout these proceedings that all the attorneys from the opponents' side have been in and out of the conference room, sharing exhibits, passing notes, conferring between examinations, and if there's a question one forgot to ask, he confers and the next guy asks it, and I've never heard of a proceeding where you take the side of an opponent to an application and you cross-examine the other opponent's witnesses."

Could the hearings examiner have made it any clearer as to the division of the parties? We think not.

Justification for the rule was stated by the hearings examiner as follows:

> "HEARINGS EXAMINER: . . . It seems to me that the only person who has the right to cross-examine is the person who is on the opposite side. I think that's the function of cross-examination. If it weren't that way, this new rule we made could be very nicely abused. In other words, the Applicants take two hours on cross-examination, the other parties, on the other side, we go back on the merry-go-round we've been on. You'll have an adequate opportunity to put in your client's case in full, with as many witnesses as you choose, and state your position very firmly, and they'll have a right to cross-examine your witnesses. I don't contemplate granting the DNR the right to cross-examine your witnesses when they're not in an adverse position to them. That's not cross-examination. It can be called cross, but it can, in effect, be redirect, unless there's

some _particular_ _issue_ _that_ _you_ _want_ _to_ _put_ _on_
_the_ _record_, _that_ _you_ _have_ _opposite_ _issue_ _as_ _far_
_as_ _granting_ _this_ _application_ _is_ _concerned_ -- _then_,
_I_ _think_ _you'd_ _be_ _in_ _a_ _position_ _that_ _could_ _legally_
_be_ _called_ _cross_, but just to encumber the record
and say, 'I want to cross-examine this witness,'
and then go ahead and try to support the witness,
I see where there could be a great deal of abuse
and unfairness in that." (Emphasis added.)

The hearings examiner in the foregoing quotation left the door at least partially open as to opponents cross-examining other opponents' witnesses when an "opposite issue" was involved, and he further expounded upon this later. His answer to a question as to whether he would permit cross-examination by an opponent of another opponent's witness if they first stated the areas in which they disagreed was that he would not say that he would permit it but he would listen and see whether there was indeed a valid issue.

It should be noted that thereafter opponents' counsel rarely requested further permission to cross-examine witnesses called by other opponents. In no case is it apparent that counsel ever informed the hearings examiner that they were opposed to a certain witness' testimony upon any particular subject, nor did they ever request permission to cross-examine an opponent's witness on any particular subject. Instead, their objections were general only, based mainly on MAPA and the Constitution.

If the floodgates had been opened by the hearings examiner in allowing unlimited cross-examination, it could have resulted in an avalanche of testimony, making the present 17,000 page transcript look like a summary or condensation. Public witnesses by the dozens turned out to testify both against and in favor of the units. Under section 70-808(1)(c), R.C.M. 1947, now section 75-20-

301(1)(c) MCA, of the Siting Act, "any other interested person" is a party to the proceeding although he waives his right under subsection (2) if he does not participate orally at the hearing. Any of these "parties" who testified at the hearing might well have insisted upon their right as a party to the proceeding to cross-examine all the witnesses, something that was not lost upon the hearings examiner as revealed in his various comments. We find the hearings examiner was literally forced to institute a ruling restricting the examination of witnesses, and this he did with fairness and dispatch.

In spite of the background of the hearings and the necessity to restrict examination of witnesses, the District Court held that at least the opponent-petitioners below had the absolute right to "cross-examine" witnesses called by other opponents, Department of Health and Department of Natural Resources.

Having provided the background, our attention is next directed to the statutes and case law.

Section 70-809(1), R.C.M. 1947, now section 75-20-222(3) MCA, of the Siting Act provides in part:

> ". . . the contested case procedures of the Montana Administrative Procedure Act [82-401 to 82-4225] shall apply to the hearing, except that neither common law nor statutory rules of evidence need apply, but the board may make rules designed to exclude repetitive, redundant or irrelevant testimony."

Section 82-4210, R.C.M. 1947, now sections 2-4-612(2) and 2-4-612(5) MCA, of the MAPA provides:

> "(1) Except as otherwise provided by statute relating directly to an agency, agencies shall be bound by common law and statutory rules of evidence. . .
>
> ". . .

-35-

"(3) A party shall have the right to conduct cross-examinations <u>required</u> <u>for</u> <u>a</u> <u>full</u> <u>and</u> <u>true</u> <u>disclosure</u> <u>of</u> <u>facts</u>, including the right to cross-examine the author of any document prepared by or on behalf of or for the use of the agency and offered in evidence."  (Emphasis added.)

It should be noted that section 556(d) of the Federal Administrative Procedure Act (5 U.S.C.A. §556(d)) is almost identical to the first part of subsection (3) above in providing that "A party is entitled to . . . conduct such cross-examination as may be required for a full and true disclosure of the facts."

The provision for cross-examination of the authors of agency documents offered in evidence found in the latter part of section 82-4210(3) is not found in the Federal Adminstrative Procedure Act nor in the Model State Administrative Procedure Act.  Rather, the provision was first proposed in Montana in 1959 in a proposed Administrative Procedure Act which the Montana Legislature did not pass. (Senate Bill 179.)  Subsequently, the MAPA passed in 1971 preserved this language.  Both proposals were made at times when the courts were concerned with the unfairness that would befall claimants for rights or privileges from governmental agencies if the claimants did not have the opportunity to challenge the factual basis of critical reports prepared for the agencies.  Greene v. McElroy (1959), 360 U.S. 474, 79 S.Ct. 1400, 3 L Ed 2d 1377; Cedar Rapids Steel Transp. v. Iowa State Com. Comm'n (Iowa 1968), 160 N.W.2d 825; Application of Plainfield-Water Co. (1953), 11 N.J. 382, 94 A.2d 673.  We find that the inclusion of the foregoing provision in our statute regarding the right to cross-examine the author of agency documents was merely a safeguard to make certain that the existing case law was recog-

nized by statute. Its inclusion does not broaden the scope of the remainder of the statute, and it should not be construed as a separate entity but rather with the statute as a whole.

Although the MAPA does not specifically define cross-examination, resort in this regard can be made to section 93-1901-4, R.C.M. 1947, now section 26-1-101(1) MCA, which provides in part:

> "Direct and cross-examination defined. The examination of a witness by the party producing him is denominated the direct examination; the examination of the same witness, upon the same matter, by the adverse party, the cross-examination . . ." (Emphasis added.)

It is obvious that the term "adverse party" was not included in the statute for any other reason but to narrow the scope of cross-examination to the adverse party.

The Montana Supreme Court, like the courts of other jurisdictions and the texts, in enunciating the general rule that cross-examination is a matter of right, limits such cross-examination to witnesses of the opposing party or adverse party. McGonigle v. Prudential Ins. Co. of America (1935), 100 Mont. 203, 46 P.2d 687; Goldberg v. Kelly (1970), 397 U.S. 254, 90 S.Ct. 1011, 25 L Ed 2d 287; 98 C.J.S. Witnesses §368; 81 Am Jur 2d, Witnesses, §464.

The right to cross-examination is subject to another limitation. The latitude of such examination is largely within the discretion of the trial court, with which the reviewing court will not interfere unless there has been a manifest abuse of discretion. McGonigle v. Prudential Ins. Co. of America, supra; State v. Carns (1959), 136 Mont. 126, 345 P.2d 735. In this connection, section 82-4211(2), R.C.M. 1947, now section 2-4-611(2) MCA, provides that

hearings examiners shall be authorized to "regulate the course of hearings." The Federal Administrative Procedure Act is almost identical to the Montana provision in providing that the presiding party may "regulate the course of the hearing." 5 U.S.C.A. §556(c)(5).

We find in view of the statutes and case law that there is really no distinction between a court trial and a contested administrative proceeding insofar as the rules applicable to cross-examination and the discretion of the court or hearings examiner are concerned. Should there be one rule for civil cases and another rule for administrative proceedings? We think not.

It would be difficult to find a case more in point than National Nutritional Foods Ass'n v. Food & Drug Admin. (2nd Cir. 1974), 504 F.2d 761, cert. denied 420 U.S. 946. Because National Nutritional is so close to this case, more space will be devoted to it than ordinarily done. The case involved the review of two final regulations of the United States Food & Drug Administration (FDA). During the presentation of the FDA's case, all parties were permitted liberal cross-examination pursuant to the hearings examiner's pretrial order which provided for cross-examination by any participant desiring to do so. The Court of Appeals, Judge Friendly writing for the court, wryly noted that so liberal a rule not unexpectedly had its cost.

After the opposition to the FDA began to offer its evidence, almost 18 months after the hearing commenced, the hearings examiner decided to limit the rights of participants to cross-examine the witnesses called by other participants. In an order the hearings examiner divided the parties into two categories--just as was done in this case--with the FDA

-38-

on one side and all other participants on the other. If any participant wished to cross-examine the witness of another participant, he was to serve a notice of intention to do so. The notice had to state that the written direct testimony of the witness was adverse to the interest of the participant, make specific reference to the portion of the testimony considered to be adverse, and state the reasons therefor. The hearings examiner would then determine whether to grant permission to cross-examine in his discretion.

The decision of the Court of Appeals approved the limitation on cross-examination of coparticipants' witnesses where no adversity existed between them; however, the court did find that in the case of one particularly important witness called by the American Medical Association (Dr. Sebrell), the hearings examiner had incorrectly determined that no adversity existed between the AMA and the National Health Federation. Accordingly, the court remanded the case to the FDA for the limited purpose of permitting reasonable cross-examination of Dr. Sebrell by the NHF or counsel of some other similarly interested participant.

It appears that the hearings examiner had made his ruling that Dr. Sebrell could not be cross-examined by the NHF even though it was explained to him at the time that the interests of the NHF and AMA were opposite rather than identical. In commenting upon this adversity, the court noted specifically that the two organizations clearly did not have "common interests" and that the NHF was substantially as adverse to the AMA as it was to the FDA.

Judge Friendly predicated the ruling upon subsection (d) of §556 of the Federal Administrative Procedure Act which provides, almost identically to section 82-4210(3),

R.C.M. 1947, now section 2-4-612(5) MCA, that a party is entitled to conduct such cross-examination as may be required for a full and true disclosure of the facts. The court pointed out that the foregoing provision does not confer a right of so-called "unlimited" cross-examination and that presiding officers will have to make the necessary initial determination where the cross-examination is pressed to unreasonable lengths.

The court further recognized that a hearings examiner must be allowed, indeed encouraged, to take steps to avoid repetitious or aimless cross-examination, particularly in a proceeding which has become so gargantuan as the one before it.

Of more than passing interest is the court's terse comment on the point which most trial lawyers have learned through sad experience--that early dreams of confounding experts by cross-examination usually are dreams indeed. The court wonders how much more there would have been for the agency to learn but that Dr. Sebrell was no ordinary witness and in fact played a key part in the preparation of the regulation.

One of the most cogent statements by Judge Friendly in National Nutritional is the following:

> ". . . In the absence of a showing of prejudice, participants with common interests should be grouped by the hearing examiner, and participants in a group should not be permitted to cross-examine witnesses called by other members of the group." 504 F.2d at 795.

We can identify the situation involving Dr. Sebrell, the key witness involved in National Nutritional, with the situation in this case where Northern Plains Resource Council was opposed to the Department of Health on water issues.

In that case the matter was remanded for cross-examination of Dr. Sebrell; in this case Northern Plains Resource Council was allowed to cross-examine the Department of Health witnesses because of the adversity of interest.

It is true that in this case the procedure was not as structured as in National Nutritional. On the other hand, on at least two occasions the hearings examiner here pointed out to counsel the possibility of opening cross-examination in the event of a valid adverse issue. He did in fact allow cross-examination on the water issues, where an adverse position existed. This should have been proof enough that, upon a proper showing of adversity, further cross-examination would be allowed. Furthermore, none of the counsel for the opposing parties, other than on water issues, ever pointed out in what respect his client was in opposition to another opponent. On the contrary all that was ever done was to interpose general objections, and when given the specific opportunity to explain the subjects where adversity existed, opposing counsel did not do so.

The federal courts have in many instances upheld rulings in administrative proceedings which denied completely cross-examination. Thus in Fried v. United States (S.D. N.Y. 1963), 212 F.Supp. 886, plaintiffs alleged denial of due process of law because the hearings examiner curtailed completely their right to cross-examine an allegedly crucial witness but the court upheld the ruling in view of the cumulative nature of the witness' testimony. And in American Public Gas Ass'n v. Federal Power Comm'n. (D.C. Cir. 1974), 498 F.2d 718, all data upon which the commission relied was tendered to the petitioners for comment, criticism and for the submittal of rebutting material. Peti-

tioners complained that they were denied the right to test through cross-examination the underlying bases for the submitted data but the court rejected the claim in holding that under the Federal Administrative Procedure Act, cross-examination is not always a right and that the petitioners had failed to demonstrate that cross-examination was required for a "full and true disclosure of the facts" under the Act.

The purposes of cross-examination have been stated as follows:

> "The office of cross-examination is to test the truth of statements of a witness made on direct examination.  Cross-examination serves as a safeguard to combat unreliable testimony, providing a means for discrediting a witness' testimony, and is in the nature of an attack on his truth or accuracy. . . The object of cross-examination, therefore, is to weaken or disprove the case of one's adversary, and break down his testimony in chief, test the recollection, veracity, accuracy, honesty, and bias or prejudice of the witness, his source of information, his motives, interest, and memory, and exhibit the improbabilities of his testimony."  98 C.J.S. Witnesses §372, pp. 125-26.

Certainly examination by the opponents of other opponents' witnesses would hardly meet the true objectives of cross-examination including the main one, to test the truth of the witness' statements.  As revealed by the record, with the exception of the water aspects of the case, the four main opposing parties were united in opposing the application.  How examination of each other's witnesses could be termed "cross-examination" under the circumstances is difficult to understand.  In fact, any such interrogation would really have amounted to nothing more than direct or redirect examination because the sole aim and purpose would have been to bolster and support the testimony already produced on the direct examination.

The District Court took the position that section 82-4210(3), R.C.M. 1947, now section 2-4-612(5) MCA, imposes a mandatory right in all parties to conduct "cross-examination" of all witnesses including the right to "cross-examine" the author of all agency documents. We find that to construe the statute so literally, without considering in the least other statutes and case law, is to ignore the entire scheme of the MAPA.

The District Court ordered the Board upon rehearing to provide opponents an opportunity to cross-examine agency witnesses. This would involve approximately 30 witnesses who are scattered throughout the United States and the world. The cost involved, not only in money but also in time, would be staggering. We have a serious doubt, as a practical matter, if the main hearings are any criteria (and we believe they are), that the procedure could be accomplished, if at all, in less than six months or more.

Judge Friendly in National Nutritional, supra, points out that the reviewing court should not remand when the outcome would clearly be only a repetition of the original decision. There must be, as he states in the main text, "a significant probability" that the proceeding for which the case was remanded would cause the agency to alter its original decision, or a need to create a better record for appellate review of the findings. 504 F.2d at 798.

We find that no substantial rights of respondents/cross-appellants have been prejudiced. The hearings examiner's decision or procedure was not erroneous or in any manner a violation of constitutional or statutory provisions.

We do, however, wish to emphasize that this case is unique in both its length and complexity. While we have

held that the hearings examiner did not err on this cross-examination issue, the procedures followed in the hearings should not be used as a model for future hearings before various state boards and agencies. We suggest, absent general procedural rules for the conduct of hearings adopted by a board or agency pursuant to the provisions of the MAPA, that prior to any hearing, a state board or agency should issue an order setting the procedural guidelines to be followed rather than delegating the entire responsibility therefor to the hearings examiner.

In summary we hold that the District Court's opinion should be affirmed on Issue Nos. 5, 7, 8, 9, 10, 11 and 12, reversed on issues 1 and 2, with issues 3, 4 and 6 being rendered moot.

The opinion of the District Court is affirmed and reversed to the extent set forth herein. The decision of the Board of Natural Resources to grant to appellants/cross-respondents a certificate of environmental compatibility and public need is hereby suspended pending compliance with this order. This cause is hereby remanded to the Board of Natural Resources to cure certain procedural defects found by the District Court and concurred in by us with the order and direction that the Board of Natural Resources do the following:

(1) Make adequate findings of fact and conclusions of law with regard to:

(a) whether using Rosebud coal and not McKay coal represents minimum environmental impact, and the reasons therefor, and

(b) whether mine-mouth generation as opposed to load-center generation represents minimum environmental impact and the reasons therefor, including considerations as to

relative energy efficiency and the relative impact of electrical transmission versus coal haulage, as required by section 70-810(1)(c), R.C.M. 1947, now section 75-20-301(2)(c) MCA.

(2) Make adequate findings of fact and conclusions of law with regard to:

(a) clearly designating a transmission line corridor;

(b) why the Board of Natural Resources prefers the chosen corridor to the alternative corridors; and

(c) what state and local legal requirements must be met, and whether in fact they have been met as required by section 70-810(1)(f), R.C.M. 1947, now section 75-20-201(2)(f) MCA.

Such findings of fact and conclusions of law shall be propounded and entered by the Board of Natural Resources, served on the parties hereto, and returned to us for review and approval within 90 days from the date hereof.

_____
Justice

We concur:

_____
Hon. L. C. Gulbrandson, District
Judge, sitting for Mr. Chief Justice Haswell

_____
Hon. B. W. Thomas, District
Judge, sitting for Mr. Justice
Daly

_____
Hon. H. William Coder, District
Judge, sitting for Mr. Justice
Sheehy

Mr. Justice Daniel J. Shea concurs in part and dissents in part and will file an opinion later.

-45-

Justice Daniel J. Shea dissenting:

There are many factors concerning this opinion which bother me deeply, but the speed with which it is suddenly being sent down and the last paragraph of the opinion are something that I must presently confine my remarks to--due to a lack of time. Just today I learned that the opinion was going down--today.

Only yesterday one of the members of our Court, at the expense of the State, chartered a plane to take the opinion to each of the district judges so that their signatures could be obtained.

The politics behind the urgency of putting this opinion down in this fashion are not something that any Court should be proud of. I know approximately a month to a month and a half ago the Governor and/or one or more of his agents talked to a member of this Court involved in this case, and expressed concern about the political bind in which the Governor was being placed because of the passage or threatened passage of the new bill on Colstrip 3 and 4. I can only say that this Court member was not me. The obvious intent was that it would sure be nice if this Court could somehow get the Governor off the hot seat by speeding up our decision. I am not suggesting that those involved intimated at all how our decision should go.

It is common knowledge that the countdown has started for the Governor to either veto or sign the legislation concerning Colstrip 3 and 4. Undoubtedly, putting our opinion down today will help considerably in helping the Governor reach the "right" political decision. To me this entire process is shocking.

-46-



FILED

APR 10 1979

Thomas J. _____

CLERK OF SUPREME COURT
STATE OF MONTANA

Now for a few brief comments on the final paragraph of the majority opinion--for which there is no foundation in law. The paragraph states:

> "Such findings of fact and conclusions of law shall be propounded and entered by the Board of Natural Resources, served on the parties hereto, and returned to us for review and approval within 90 days from the date hereof."

Where in the law, may I ask, does it give this Court the power to exercise continuing jurisdiction over governmental agencies once we have remanded the case to them for further determinations? And where in the law do we have the authority, without an appropriate petition, after the governmental agency has acted, to completely bypass the Administrative Procedure Act and the District Court, in the event one or more of the aggrieved parties would have chosen to file a petition for review in the District Court?

There is nothing in the Administrative Procedure Act which authorizes this Court to tell any agency how soon it may act after a remand from this Court. There is nothing that I know of in any of the remaining statutes or case law of this State to justify such a result. Once this Court has acted on an appeal and remanded a case, either to a District Court, or to an administrative agency, we lose jurisdiction. We cannot sit here like a king with strings still attached to the parties and directing them like puppets to comply with our orders. Here we have told the agency to act and get the results back to us within ninety days. This is judicial usurpation at its worst.

Daniel J. Alea
Justice

-47-

Mr. Justice Daniel J. Shea dissenting:

There are many factors concerning this opinion which bother me deeply, but because of the speed with which it was sent down, I have not had time to formulate a dissent. For this reason I must confine my comments at this point to the final paragraph of the majority opinion--for which there is no foundation in law. The paragraph states:

> "Such findings of fact and conclusions of law shall be propounded and entered by the Board of Natural Resources, served on the parties hereto, and returned to us for review and approval within 90 days from the date hereof."

Where in the law, may I ask, does it give this Court the power to exercise continuing jurisdiction over governmental agencies once we have remanded the case to them for further determinations? And where in the law do we have the authority without an appropriate petition, after the governmental agency has acted, to completely bypass the Administrative Procedure Act and the District Court, in the event one or more of the aggrieved parties would have chosen to file a petition for review in the District Court?

There is nothing in the Administrative Procedure Act which authorizes this Court to tell any agency how soon it may act after a remand from this Court. There is nothing that I know of in any of the remaining statutes or case law of this State to justify such a result. Once this Court has acted on an appeal and remanded a case, either to a District Court, or to an administrative agency, we lose jurisdiction. We cannot sit here like a king with strings still attached to the parties and directing them like puppets to comply with our orders. Here we have told the agency to act and get the results back to us within ninety days. This is judicial usurpation at its worst.

Daniel J. Shea

Justice