No. 79-54

IN THE SUPREME COURT OF THE STATE OF MONTANA

1981

_____

THE CITY OF HELENA, MONTANA,

Petitioner and Appellant,

vs.

MONTANA DEPARTMENT OF PUBLIC
SERVICE REGULATION et al.,

Respondents.

_____

No. 81-24

_____

CITY OF BILLINGS, a municipal corporation,

Petitioner and Appellant,

vs.

MONTANA DEPARTMENT OF PUBLIC SERVICE et al.,

Respondents,

and

MONTANA PUBLIC CONSUMER COUNSEL,

Intervenors.

Appeal from: District Court of the First and Thirteenth Judicial
District
In and for the Counties of Lewis and Clark and
Yellowstone.
Honorable Nat Allen, Judge presiding.

Counsel of Record:

For Appellants:

Calton Law Firm, Billings, Montana
Calvin Calton argued, Billings, Montana
Rod Hamman argued, Billings, Montana
Hull and Sherlock, Helena, Montana

For Respondents:

Crowley Law Firm, Billings, Montana
Thomas M. Kelley argued, Billings, Montana
Robert F. W. Smith argued, P.S.C., Helena, Montana

For Intervenors:

James Paine argued, Consumer Counsel, Helena, Montana

For Amicus Curiae:

David V. Gliko, City Attorney, Great Falls, Montana

_____

Submitted: July 6, 1981

Decided: SEP 21 1981

Filed: SEP 21 1981

Thomas J. Kearney
Clerk

Justice Frank B. Morrison, Jr., delivered the Opinion of the Court.

On March 31, 1977, the City of Helena filed an application for a rate increase for the water utility service owned by the City. Part of the requested rate increase was for amortization of an existing operating deficit in the water services fund. The amount of the deficit was $311,360.51.

A hearing on this application was held before the Public Service Commission (PSC) June 21, 1977. On April 3, 1978, the PSC issued order no. 4335(a), which denied the City's request for amortization of the past operating loss.

The City of Helena filed a petition for judicial review with the Lewis and Clark County District Court on May 24, 1978. On July 11, 1979, the District Court upheld the decision of the PSC denying amortization.

In 1977, the City of Billings authorized the engineering firm of Black and Veatch to conduct a rate study regarding the municipally-owned water utility. Black and Veatch determined that if the City of Billings continued to operate under the current rates, it would have a monthly deficit of $84,000. The engineering firm calculated that a 65 percent increase in the water rates, amounting to an annual increase in revenues of $1,636,000, was necessary to maintain the water utility on a sound financial basis.

On September 12, 1977, the recommended increase was adopted by a unanimous vote of the Billings City Counsel. On October 17, 1977, the City of Billings filed a petition with the Montana PSC seeking approval of the new rates for the period January 1978 through June 1980. The City of Billings also petitioned for a temporary rate increase, to be effective during the pendency of the rate proceedings.

The Billings Heights water district and the Montana Consumer Counsel intervened in the proceedings.

On March 6, 1978, the PSC granted the City of Billings a temporary rate increase. On March 21, 1978, a hearing on the proposed permanent rate increase was held before the PSC.

On July 17, 1978, the PSC issued its findings of fact, conclusions of law and order. The PSC granted the City of Billings a 42 percent increase in its water rates amounting to an annual revenue of $1,069,728. The PSC determined that past losses suffered by the water utility could not be considered in setting the new rate increase. The PSC also set forth cost of service allocations for the City of Billings to abide by.

The Montana Consumer Counsel petitioned the District Court of the First Judicial District, Lewis and Clark County, for judicial review of the PSC's order. The City of Billings sought judicial review of the same PSC order before the District Court of the Thirteenth Judicial District, Yellowstone County. The venue conflict was resolved by a Supreme Court order on April 6, 1979, finding the Yellowstone County District Court the proper venue for processing the petitions. Both appeals were consolidated for hearing by agreement of the parties.

The matters were heard before the Thirteenth Judicial District Court on May 8, 1980. On September 19, 1980, the District Court issued an opinion and order, affirming the PSC's decision except in one respect. The District Court found that the PSC erred in holding that past losses of the utility could not be taken into consideration in determining a rate increase.

The District Court's order was certified as final and subject to appeal by an order dated October 14, 1980.

The following issues are raised on appeal:

1. Whether the PSC has jurisdiction over the City of Billings water utility service?

2. Whether the PSC has jurisdiction over the Billings Heights water district water utility service?

3. Whether the PSC failed to grant the City of Billings and the City of Helena a sufficient rate increase to meet the revenue needs of the respective water utilities because the PSC refused to consider past losses suffered by the municipal water utilities?

4. Whether the PSC failed to grant the City of Billings a sufficient rate increase by refusing to accept the City's projected operation and maintenance costs?

5. Whether the PSC was required to comply with all city bond ordinance requirements when establishing a sufficient rate increase?

6. Whether the PSC determined sufficiency of the rate increase without normalizing test-year data to reflect weather conditions?

7. Whether the PSC erred in allocating the cost of services among City of Billings customers by refusing to accept the City's extra capacity factor assigned the Billings Heights water district pursuant to a contract provision contained in the City-District water supply contract?

8. Whether the PSC erred in allocating the cost of services among city customers by granting a rate of return credit of 27.5 percent to Billings Height water district customers who live within city limits?

9. Whether the PSC order requiring the City of Billings to establish a recurring annual capital improvements account

-4-

and report activity in such account interferes with the City's management authority?

10. Whether the PSC overstated the City of Billings' revenue needs by not considering the excess "coverage factor" monies to be an offset to the City's required expenditure needs.

11. Whether the District Court erred by allowing additional evidence subsequent to the agency hearing.

The City of Billings contends that provisions contained in the Municipal Revenue Bonds Act of 1939, sections 7-7-4401, et seq., MCA, which confer ratesetting authority upon municipalities, exempts muncipally-owned water utilities from the jurisdiction of the PSC. The specific provisions read as follows:

> "In addition to the powers which it may now have, any municipality shall have the power under this part to:
>
> ". . .
>
> "(3) prescribe and collect rates, fees, and charges for the services, facilities, and commodities furnished by such undertaking." (Section 7-7-4404, MCA.)
>
> "The governing body of a municipality issuing bonds pursuant to this part shall prescribe and collect reasonable rates, fees, or charges for the services, facilities, and commodities of such undertaking and shall revise such rates, fees or charges from time to time whenever necessary so that such undertaking shall be and always remain self-supporting." (Section 7-7-4424(1), MCA.)

The Public Utilities and Carriers Act, sections 69-1-101, et seq., MCA, enacted in 1913, grants the PSC ". . . full power of supervision, regulation, and control of . . . public utilities . . . to the exclusion of the jurisdiction, regulation, and control of such utilities by any municipality, town or village." Section 69-3-102, MCA. It is clear that a municipally-owned water utility fits within the definition of a "public utility", set forth in section 69-3-101, MCA:

". . . every corporation, both public and private, company, individual, association of individuals, their lessees, trustees, or receivers appointed by any court whatsoever, that now or hereafter may own, operate, or control any plant or equipment, any part of a plant or equipment, or any water right within the state for the production, delivery or furnishing for or to other persons, firms, associations, or corporations, private or municipal:

". . . (5) water for business, manufacturing, household use, or sewerage service, whether within the limits of municipalities, towns, or villages or elsewhere . . ."

A specific function of the PSC is the supervision and regulation of rates charged by public utilities. Sections 69-3-301 and 69-3-302, MCA. Under these provisions a public utility must file schedules of its rates, tolls, or charges with the PSC. Any changes in these schedules must be approved by the PSC. The PSC, pursuant to section 69-3-303, MCA, must notify the public of such proposed changes and schedule a hearing on the matter.

Following a hearing, if the proposed rate schedules are found to be ". . . unjust, unreasonable or unjustly discrimina-tory or to be preferential or otherwise in violation of the provisions of this chapter," then "the commission shall have the power to fix and order substituted therefor such rates, tolls, charges, or schedules as shall be just and reasonable . . ." Section 69-3-330, MCA.

The City of Billings contends that this power of the PSC is irreconcilable with the municipal powers set forth in the Municipal Revenue Bonds Act of 1939. The Bonds Act specifically provides that: "(3) Insofar as the provisions of this part are inconsistent with the provisions of any other general, special, or local law, the provisions of this part shall be controlling." Section 7-7-4403(3), MCA. City of Billings argues that the rate setting authority of a municipality under this Bonds Act necessarily precludes PSC jurisdiction.

-6-

It must be noted at the outset that the Municipal Revenue Bonds Act of 1939 does not expressly repeal the Public Utilities and Carriers Act, Title 69. To give credence to the contentions of the City of Billings would necessitate a finding of repeal by implication. Such repeal by implication is not favored in Montana. London Guaranty & Accident Co. v. Industrial Acc. Board (1928), 82 Mont. 304, 266 P. 1103. This Court has stated that ". . . an implied repeal results only from an enactment, the terms and necessary operation of which cannot be harmonized with the terms and necessary effect of an earlier Act." (Citations omitted.) London Guaranty & Accident Co., supra, 266 P. at 1105. In determining whether the Municipal Revenue Bonds Act of 1939 and the Public Utilities and Carriers Act can be harmonized the intention of the legislature is controlling. Section 1-2-102, MCA.

After a careful review of the Municipal Revenue Bonds Act of 1939 and the Public Utilities and Carriers Act, we find that the provisions of the two acts can be harmonized. The legislature recognized that municipalities had the best resources available to arrive at an initial determination of what the rate or toll should be for the utility service provided. The legislature further recognized the municipalities' inherent interest in collecting the rates or tolls charged. Thus the legislature granted municipalities these powers under the Municipal Revenue Bonds Act as well as other acts.

However, nothing in the Municipal Revenue Bonds Act precludes a review of such rate determinations. This is precisely the function of the PSC. The legislature intended such a review process by the very creation of such a regulatory and supervisory body.

We hold that municipalities do establish rates for their services as required by sections 7-7-4404 and 7-7-4424, MCA, when municipalities comply with the PSC reporting requirements set forth in sections 69-3-301 and 69-3-302, MCA. The regulatory authority of the PSC does not diminish a municipality's ability to establish an initial rate schedule. The two acts are not irreconcilable, and the PSC has jurisdiction over municipally-owned utilities.

The second jurisdictional issue arises as a result of the PSC order requiring the City of Billings and the Billings Heights water district to enter into a stipulation through which a cost of service credit for district customers living within Billings city limits could be implemented. In a prior order, no. 4366, rendered July 20, 1977, of which this Court takes judicial notice pursuant to Rule 202(b)(4), Mont.R.Evid., the PSC determined that "[r]ather than being subject to Commission control, these [County Water Districts] are subject to the control and ratemaking power of their own board of directors . . ." If this determination holds true, the PSC had no authority to order the Billings Heights water district to enter into the stipulation with the City of Billings. Thus, this Court must review the jurisdictional parameters of the PSC over county water districts created under sections 7-13-2201 through 7-13-2348, MCA.

Although the PSC acknowledged in order no. 4366 that county water districts clearly fit the definition of a "public utility" as set forth in section 69-3-101(5), MCA, it declined jurisdiction over county water districts based primarily on section 7-13-2301(1), MCA. This statute provides that: "The board of directors shall fix all water and sewer rates and shall, through the general manager, collect the

sewer charges and the charges for the sale and distribution of water to all users."

The board of directors is a specially elected body whose sole function is to govern the water district. Section 7-13-2231(2), MCA. It is the position of the PSC that this statutorily-created governing body displaces the regulatory function of the PSC.

After review of sections 7-13-2201 through 7-13-2348, MCA, we cannot agree with this position. Nothing within these statutes expressly precludes the review and regulatory process of the PSC pursuant to Title 69, MCA. This board of directors was only intended to displace the county commissioners' authority with regard to water and sewer functions. Section 7-13-2231(2), MCA. Thus, the function of county water district commissioners resembles the function of municipalities in the ratemaking process. The board of directors is empowered to establish rates; however, such rates are subject to review and alteration by the PSC if unjust, unreasonable or discriminatory. Section 69-3-330, MCA. This interpretation is buttressed by section 7-13-2202, MCA:

> "Nothing in this part and part 23 shall be so construed as repealing or in any wise modifying the provisions of any other act relating to water or sewers . . ."

Surely, the legislature had in mind the provisions of Title 69, MCA, regarding the regulation, supervision, and control of public utilities when it enacted legislation giving rise to county water districts. Therefore, we hold that the PSC is invested with jurisdiction over county water districts relating to the ratesetting process. The PSC had the authority to order the City of Billings and the Billings Heights water district to enter into necessary stipulations.

In disposing of issues no. 3 through 8, this Court is guided by the standard of review set forth in Cascade County Consumers Ass'n. v. Public Serv. Com'n. (1964), 144 Mont. 169, 192-193, 394 P.2d 856, 868, cert.den., 380 U.S. 909, 85 S.Ct. 891, 13 L.Ed.2d 796:

> "We have repeatedly held that there will be no interference with the orders of the Commission unless:
>
> "(1) they go beyond the power constitutionally given; or,
>
> "(2) beyond their statutory power; or
>
> "(3) they are based upon a mistake of law.
>
> "However, questions of fact may be involved in determination of questions of law, so that an order, regular on its face, may be set aside if it appears:
>
> "(1) that the rate is so low as to be confiscatory and in violation of the constitutional prohibition against taking property without due process of law; or
>
> "(2) that the Commission acted so arbitrarily and unjustly as to fix rates contrary to evidence, or without evidence to support it, or
>
> "(3) that the authority therein involved has been exercised in such an unreasonable manner as to cause it to be within the elementary rule that substance, and not shadow, determine the validity of the exercise of the power." (Citations omitted.)

The City of Billings first contends that the PSC erred by refusing to accept projections of future operating and maintenance expenses. The City asserts that this refusal amounts to a mistake of law because the refusal was made in ". . . accordance with numerous past cases . . ."

No statute exists denominating the method or methods the PSC must use in reviewing and determining rates. In the case at bar the PSC used known financial data supplied by the City of Billings and then either added or subtracted known normalized changes and adjustments in arriving at a test-year calculation. This Court has already determined that use of test-year calculation and average-year rate base

is a correct and proper method of valuation. Petition of Montana Power Co. Etc. (1979), ___Mont.___, 590 P.2d 1140, 36 St.Rep. 312. Therefore, we affirm the PSC's use of this particular method of valuation in the case before us.

Secondly, the City of Billings and the City of Helena contend that the PSC erred by refusing to consider past losses suffered by the municipally-owned water utilities, when determining the new rates.

It is clearly the law that utilities may not set their rates so as to amortize past deficits. The foundation case for this rule is Galveston Elec. Co. v. Galveston (1922), 258 U.S. 388, 395, 42 S.Ct. 351, 354, 66 L.Ed. 678, 683, where the United States Supreme Court stated:

> "A company which has failed to secure from year to year sufficient earnings to keep the investment unimpaired and to pay a fair return, whether its failure was the result of imprudence in engaging in the enterprise, or of errors in management, or of omission to exact proper prices for its output, cannot erect out of past deficits a legal basis for holding confiscatory for the future, rates which would, on the basis of present reproduction value, otherwise be compensatory."

Based on this, federal courts have consistently adhered to the "no losses rule." This rule was recently espoused in Nader v. F.C.C. (D.C. Cir. 1975), 520 F.2d 182, 202, where the court stated:

> "It is, of course, a cardinal principle of ratemaking that a utility may not set rates to recoup past losses, nor may the Commission prescribe rates on that principle."

However, as the City correctly points out, this line of cases involves only private investment utilities. The City would have this Court distinguish between municipal utilities, where no profit or rate of return is allowed and private investment utilities, where a profit margin is allowed in the rate. The City claims that since municipal utilities have no profit margin to fall back on, their losses should be amortized by future rate increase.

Admittedly, municipalities are caught in an inflationary squeeze. However, the case law regarding the "no loss rule" does not restrict that rule to private investment utilities. The PSC has not been unmindful of the problems faced by the City. The PSC has in the past, and in this case, given municipalities special treatment, by allowing municipalities sufficient money to complete all improvement projects which have been deferred. Deferral of improvements is one means a city has to provide money for other expenditures. When the PSC grants sufficient funds to make up these projects, it is in effect, making up past losses of the city under a controlled plan. This appears to be a better policy regarding losses and to an extent avoids inefficient management. Therefore, we hold that the PSC is not required to consider the past losses suffered by the municipally-owned utility as part of the rate base for establishing a new rate.

The City of Billings next contends that the PSC erred by not correctly applying all of the City's revenue bond coverage tests contained in the City's bond ordinances. The City points out that these bond ordinances contain three separate coverage tests; one historical in application and two prospective in application.

The basic purpose of these coverage tests is to provide some security for present bond holders. These tests state that the municipality may not incur new bond indebtedness unless net revenue to be generated by the utility equals an established amount both at the time of issuance as well as for five consecutive years following issuance. Thus, as conceded by counsel for the City at oral argument, these coverage tests relate solely to the City's ability to issue new bonds. If these tests cannot be met by the rates allowed by the PSC, the City cannot incur new indebtedness; however, this does not place existing bonds in default.

In establishing a new rate for the City of Billings, the PSC applied only the historical coverage test in determining the City's revenue requirements necessary to satisfy its bond debt service for the petitioned application period. The City of Billings had a proposed bond issuance scheduled for 1979 which could have been precluded for failure to meet the bond ordinance requirements. However, the PSC eliminated such an occurrence, at least with regard to rate sufficiency, by ordering that the City ". . . upon sale of 1979 bond issue . . . file tariffs reflecting an across the board percentage increase equal to the increase in revenues necessary to meet the expenses incurred in the new bond issuance." Thus, the PSC, although not in strict compliance with the City ordinances, granted a sufficient rate to meet the City's required bond debt service amount.

There is no directive, either statutory or judicial, which requires the PSC to strictly comply with City bond ordinance mandates. Such ordinances are not binding upon the PSC and the PSC in no way acts as an insurer for municipal bond issuances. Therefore, the PSC properly acted within its realm of discretion in determining the City's necessary bond debt service requirements and in setting rates accordingly.

The last issue raised by the City of Billings with regard to insufficiency of the rate granted, concerns normalization of test-year data to reflect weather conditions. The City asserts that the PSC erred in not taking into account drought conditions in 1977, the year which the PSC used as its test year for calculations. The City asserts that this failure on the part of the PSC overestimates the City's revenues and thus underestimates the needed rate increase.

The PSC has no statutory duty to normalize test-year data. Therefore it is within its discretion to determine

when normalization is necessary. Testimony regarding normalization was presented to the PSC at the hearing. The calculations of the PSC based on the 1977 test-year data do not reflect any adjustments with respect to weather conditions. Impliedly, the PSC deemed normalization unnecessary in this case.

We will not substitute our judgment for that of the PSC on appeal. The PSC had evidence before it upon which to reach a determination on this issue. The PSC did not act unreasonably nor did it establish a rate which was so low as to be confiscatory. Cascade County Consumers Ass'n., supra. Therefore, the PSC's determination is not clearly erroneous and must be upheld. Rule 52(a), M.R.Civ.P.

The City of Billings contends that the PSC erred in allocating cost of services to the Billings Heights water district based upon a different extra capacity factor than that proposed by the City and upon a different rate of return for city residents who receive water from the District. The PSC heard testimony from all parties regarding the calculation of the extra capacity factor to be assigned the Billings Heights water district for use in allocating the district's costs of service. The PSC chose to reject the City's proposed extra capacity factor which was based upon a contract provision between the two parties. Instead the PSC chose to assign an extra capacity factor based upon actual water use as derived from witnesses testifying for the district as well as comparisons derived from large water consumers with demands similar to the Billings Heights water district. The PSC had substantial evidence before it in determining the extra capacity factor to be assigned to the district. This decision is not clearly erroneous and thus must be upheld. Rule 52(a), M.R.Civ.P.

Secondly, the PSC determined that City residents who were water customers of the district were entitled to the same cost of service benefit which inside City customers received. Inside City customers were assigned a 6.2 percent rate of return whereas outside City customers were assigned a 7.5 percent rate of return. The reason for this different rate of return was given by Robert Benson, rate analyst for the Black & Veatch consulting firm. His testimony revealed that ". . . there are certain ancillary costs and obligations associated with the Water System which the City residents alone bear in taxes." Examples of these costs and obligations are:"Fire and police protection, the long term provision and maintenance of streets (which may be adversely affected by operation of the Water System), and the obligation of the City to provide the Water System irrespective of the flexibility which may be exercised by outside City residents to obtain an alternative water supply . . ."

As a result of this testimony, the PSC determined that all City residents, regardless of whether they were City water customers or district water customers were entitled to the cost of service benefit. Therefore, the PSC ordered that the City and the district enter into a stipulation by which this benefit could be passed on to the district customers who resided within City limits.

The City contends that the determinative factor in deciding who receives the cost of service benefit is not whether the party is a City taxpayer, but instead whether the party is a City water customer. We disagree. The ancillary costs and obligations testified to by Mr. Benson are elements which City tax dollars support. It matters not that the municipal utility is paid for completely by generated revenue and not through tax dollars. Therefore, all City

residents who are taxpayers are entitled to the cost of service benefit.

Since we have already determined that the PSC has jurisdiction over the Billings Heights water district, the order of the PSC requiring the City and district to effect the passing on of the cost of service benefit to City residents receiving water from the district, is valid.

The City next contends that the PSC's order requiring the City to establish an account to show activity regarding funds granted for recurring annual capital improvements interferes with the City's managerial authority, thus contravening the requirements of the Municipal Revenue Bond Act of 1939 and city ordinance no. 3647. We find this issue completely without authority.

The PSC determined that:

"An increase of $442,518 in RACI is justified and reasonable; however, the Commission in exercising its regulatory discretion directs that the Applicant is to keep the Commission currently informed of the revenues expended for RACI. In order to assure just and reasonable rates and service the Commission herein requires that the Applicant establish and maintain an account entitled Recurring Annual Capital Improvements. Furthermore, the Commission requires that the Applicant provide the Commission with monthly reports detailing activity in this account."

This order in no manner dictates which projects may receive City Capital Improvements funds. It also does not require any specific time table for such expenditures. Thus, it does not interfere with the City's decision-making process with regard to this fund; it merely establishes a means of accountability.

Pursuant to section 69-3-106, MCA, the PSC is granted supervisory authority over municipally-owned utilities. This provision states that:

"(1) The commission shall have authority to inquire into the management of the business of

-16-

all public utilities, shall keep itself informed
as to the manner and method in which the same is
conducted, <u>and shall have the right to obtain from
any public utility all necessary information to</u>
enable the commission to perform its duties."
(Emphasis added.)

Furthermore, section 69-3-202, MCA, provides in pertinent part:

"(1) Every public utility shall keep and render
to the Commission, in the manner and form pre-
scribed by the commission, uniform accounts of
all business transacted."

Clearly, the legislature envisioned the precise reporting requirement ordered by the PSC. The maintenance of the recurring annual capital improvements account does not run contrary to the provisions of the City's bond ordinance nor the provisions of the Municipal Revenue Bonds Act of 1939. The maintenance of such an account is a legitimate means by which the PSC can stay abreast of activities over which it has supervisory and regulatory authority. Therefore, this aspect of the PSC's decision is affirmed.

The Montana Consumer Counsel raises two issues on appeal. The Consumer Counsel first contends that the PSC erred with respect to the City's needed bond debt service requirements. As stated previously, the PSC determined the City of Billings bond debt service revenue needs via a test-year method. The PSC then chose to apply the historical coverage factor calculation contained in bond ordinance no. 3647, in order to aid the City in future bond issues. This test requires that revenue generated by the City must at least be 125 percent of the revenue generated by the City in any 12 consecutive months in the 18th month period prior to the application for a rate increase. The Consumer Counsel asserts that this extra 25 percent coverage factor money does not actually have to be paid, for bond debt service, but can be used by the City for other expenditures.

-17-

This issue strikes at the heart of the PSC's discretion in calculating revenue requirements. The PSC determined the bond debt service revenue needs of the City of Billings and they chose to include this coverage factor money in their calculations. We find the method employed by the PSC to be within their discretion and lawful. Ratemaking choices of the PSC will be honored by this Court if within lawful parameters.

The Montana Consumer Counsel also appeals the decision of the Thirteenth Judicial District Court, allowing the City of Billings to introduce additional documentary exhibits for purposes of judicial review. In light of this Court's decision to affirm the order of the PSC in its entirety, this issue is moot.

In conclusion, we affirm the decision of the District Court of the Thirteenth Judicial District in all respects, except as to amortization of past losses, which is reversed. We affirm the decision rendered by the First Judicial District Court.

_____
                Justice

We concur:

_____
        Chief Justice

_____

_____

_____
                Justices

-18-

_____
            Justice

_____
Honorable James B. Wheelis sitting
in place of Honorable Daniel J. Shea.