No. 84-290
IN THE SUPREME COURT OF THE STATE OF MONTANA
1984

THE MONTANA POWER COMPANY,
a Montana corp.,

        Plaintiff and Petitioner,

  -vs-

THE PUBLIC SERVICE COMMISSION
OF THE STATE OF MONTANA, et al.,

        Defendants and Respondents.

ORIGINAL PROCEEDING:

COUNSEL OF RECORD:

      For Plaintiff/Petitioner:

            Daniel O. Flanagan, John J. Burke, John L. Peterson,
            Dennis R. Lopach, Pamela K. Merrell for Montana Power
            Company, Butte, Montana; John L. Peterson argued

      For Defendants/Respondents:

            Eileen Shore argued, Public Service Commission, Helena,
            Montana

      For Intervenors:

            Hon. Mike Greely argued, Attorney General, Helena,
            Montana
            James C. Paine argued, John C. Allen, Montana
            Consumer Counsel, Helena, Montana
            Kurt Krueger, Butte Community Union, Mt. Assoc. of
            Senior Citizens, Butte, Montana & Robert C. Rowe,
            Missoula, Montana
            Patrick L. Smith argued, Northern Plains Resource
            Council, Billings, Montana
            Daniel Kemmis & Jeanne Kemmis, Human Resources Council,
            Dist. XI, Missoula, Montana
            John Doubek argued, Richard Pyfer, Montana Irrigators,
            Helena, Montana
            Donald W. Quander, Ideal Basic Industries, ASARCO,
            Billings, Montana
            C. William Leaphart, Champion International & CONOCO,
            Helena, Montana & Linwood Morrell, New York, New York
            Capt. Edwin T. Peterson, U.S. Air Force, Great Falls,
            Montana
            Robert L. Deschamps, III, Missoula County Attorney,
            Missoula, Montana
            James Robischon, Atlantic Richfield, Stauffer Chemical
            Co., EXXON, Butte, Montana
            Charles W. Keuther, Great Falls Gas Co., Great Falls,
            Montana
            Grant E. Tanner; Lindsay, Hart, Neil & Weitler, D.S.I.,
            Portland, Oregon

                 Submitted: November 26, 1984
                   Decided: December 12, 1984

Filed: DEC 12 1984

_Ethel M. Harrison_
Clerk

Mr. Justice Fred J. Weber delivered the Opinion of the Court.

Montana Power Company (MPC) requested that this Court assume original jurisdiction of a petition for declaratory judgment, mandate or other appropriate relief. This Court assumed jurisdiction to decide whether the certificate issued by the Board of Natural Resources and Conservation (BNRC) is conclusive and binding on the Public Service Commission (PSC). On this narrow legal question, we hold that the certificate is not conclusive and binding on the PSC.

The issues as stated more broadly for analysis are:

1. Did passage of the Montana Facility Siting Act of 1973 (Siting Act), section 75-20-101, et seq., MCA, impliedly repeal or otherwise limit the PSC's express statutory rate-making authority under section 69-3-109, MCA to determine in a rate case whether public utility property is "actually used and useful for the convenience of the public"?

2. Does the doctrine of collateral estoppel preclude the PSC from considering whether Colstrip Unit 3 is "actually used and useful" under section 69-3-109, MCA?

3. Does the doctrine of promissory estoppel require the PSC to include in the rate base MPC's share of costs for Colstrip Unit 3?

As enacted in 1973 and amended in 1975, the Siting Act provided that a power facility may not be constructed or operated within Montana without a certificate of environmental compatibility and public need. The Siting Act requires a comprehensive study, hearings, and evaluation of any proposed facility before a certificate may be issued.

In 1973, MPC and several other utilities filed with the Department of Natural Resources and Conservation (DNRC) an application for a certificate of environmental compatibility and public need for Colstrip Units 3 and 4. We are concerned here only with Colstrip Unit 3. After extensive hearings,

2

debate and study, the BNRC granted the certificate to MPC on July 22, 1976.

That certificate was based upon the BNRC's findings of fact of which the following are pertinent:

- By the time Colstrip 3 is completed there will be a need for the energy produced.

- The facilities will serve the public interest, convenience and necessity.

- The loads and resources forecast by the utilities indicate an energy deficit in future years.

- The utility forecasts support a conclusion that Colstrip 3 will be needed.

- MPC studies show that Colstrip 3 is the lowest cost alternative for the consumer and the best choice available for future power needs.

- Availability of the additional energy will be beneficial to the population of Montana and the Pacific Northwest.

The certificate was also based upon extensive and detailed findings concerning the environmental and social impacts of Colstrip Units 3 and 4.

In its conclusions of law, the BNRC concluded that there was a need for the energy that would be produced by Colstrip Units 3 and 4 and that these facilities would serve the public interest, convenience and necessity. The BNRC ordered that a certificate of environmental compatibility and public need issue to the applicant utilities for Colstrip Units 3 and 4 and associated facilities.

The decision of the BNRC was appealed twice to this Court. Northern Plains Resource Council v. Board of Natural Resources and Conservation (1979), 181 Mont. 500, 594 P.2d 297; Northern Plains Resource Council v. Board of Natural Resources and Conservation (1979), 183 Mont 540, 601 P.2d 27. These opinions did not address the BNRC's determination that the energy produced by Colstrip Units 3 and 4 was needed, and did not consider changes in electricity rates to consumers

3

which might result from the construction of Colstrip Units 3 and 4.

After completion of Colstrip 3 in 1983, MPC filed with the PSC an application to increase electric service rates to reflect the inclusion of Colstrip 3 and associated facilities in its rate base. The PSC conducted hearings which included extensive evidence regarding whether Colstrip 3 was "actually used and useful" to ratepayers. MPC moved the PSC to strike all portions of the testimony concerning the "used and useful" issue, contending that the PSC was precluded by the BNRC's certificate from considering that matter. The PSC took MPC's motion under advisement. MPC then filed its original application with this Court. The PSC later denied the MPC motion and concluded that Colstrip 3 was not actually used and useful and therefore could not be included in MPC's rate base.

I

Did passage of the Siting Act impliedly repeal or otherwise limit the PSC's express statutory rate-making authority under section 69-3-109, MCA to determine whether public utility property is "actually used and useful for the convenience of the public"?

The purposes of the Siting Act are stated in section 75-20-102, MCA:

"(1) It is the constitutionally declared policy of this state to maintain and improve a clean and healthful environment for present and future generations, to protect the environmental life support system from degradation and prevent unreasonable depletion and degradation of natural resources, and to provide for administration and enforcement to attain these objectives.

"(2) The legislature finds that the construction of additional power or energy conversion facilities may be necessary to meet the increasing need for electricity, energy, and other products and that these facilities have an effect on the environment, an impact on population concentration, and an effect on the welfare of the citizens of this state. Therefore, it is necessary to ensure that

4

the location, construction, and operation of power
and energy conversion facilities will produce
minimal adverse effects on the environment and upon
the citizens of this state by providing that a
power or energy conversion facility may not be
constructed or operated within this state without a
certificate of environmental compatibility and
public need acquired pursuant to this chapter."

The purposes of the Siting Act may be characterized as environmental in a broad sense.

Section 75-20-211, MCA required MPC to file with the DNRC and the Department of Health an application for a certificate containing a description of the facility to be built, a summary of environmental impacts, a statement of the need for the facility, a description of alternate locations and their comparative merits, and other relevant information. The Department of Health and the DNRC were then required to study the proposed facility. The determination of the Department of Health or Board of Health is acceptable in lieu of an environmental impact statement under the Montana Environmental Policy Act. Section 75-20-216, MCA. Other sections specify the hearing procedure which was followed in this case.

Section 75-20-301(2), MCA provides that the BNRC may not grant a certificate unless it shall find and determine:

-   The basis of the need for the facility.

-   The nature of the probable environmental impact.

-   That the facility represents the minimum adverse environmental impact.

-   Each of the environmental criteria described in section 75-20-503, MCA, which include an extensive list of factors related to energy needs and impacts upon land use, water resources, air quality, solid waste, and noise.

-   That the location conforms to state and local laws and regulations.

-   That the facility will serve the public interest, convenience and necessity.

5

Hon. Fred J. Weber
Justice, Supreme Court
Room 414 Justice Building
215 North Sanders
Helena, Montana  59620

CORRECTION. In preparing this opinion for publication, we noted in our verification of titles and citations the matters listed below. Corrections have been made on our copy of the opinion.

January 23, 1985

Montana Power Co. v. Public Service Com'n, No. 84-290, Dec. 12, 1984

Page 6, line 7 - - Section 70-20-503(1) should read Section 75-20-503(1).

*ok*

**WEST PUBLISHING COMPANY**
Box 43526
St. Paul, MN 55164

In considering the question of public interest, convenience and necessity, the Board is required to evaluate the benefits to the applicant and the state, the effects of resulting economic activity, the effects of the facility on public health, welfare and safety, and any other relevant factors.

Section 75-20-503(1), MCA further requires that the BNRC and DNRC consider the following list of "environmental factors":

- Energy needs.

- Growth in demand and projections of need.

- Availability and desirability of alternate sources of energy.

- Promotional activities of the utility which may have given rise to the need for the proposed facility.

- Socially beneficial uses of the output.

- Conservation activities which could reduce the need for more energy.

- Research activities and new technology available to minimize environmental impact.

In connection with land use impacts, the statute requires a consideration of the local impact of population attracted by construction and operation of the facility, as well as the impact of energy availability on the growth patterns and population dispersal of the state. The environmental factors include many additional considerations.

Montana law pertaining to the regulation of public utilities is set forth in Title 69, Chapter 3, MCA. Section 69-3-102, MCA provides that the PSC is invested with full power of supervision, regulation and control of public utilities, subject to the provisions of Chapter 3. Section 69-3-109, MCA provides:

"The commission may, in its discretion, investigate and ascertain the value of the property of every public utility actually used and useful for the convenience of the public. The commission is not

6

bound to accept or use any particular value in determining rates; provided, that if any value is used, such value may not exceed the original cost of the property. In making such investigation the commission may avail itself of all information contained in the assessment roles of various counties, the public records of the various branches of the state government, or any other information obtainable, and the commission may at any time of its own initiative make a revaluation of such property." (emphasis added)

While MPC agrees that under the foregoing section, the PSC is required to determine whether property of the utility is "actually used and useful," it contends that the PSC is required to treat Colstrip 3 as actually used and useful because it has been certified by the BNRC. This proceeding requires a determination of what limitation on the powers of the PSC, if any, results from facility certification under the Siting Act.

Other provisions in Title 69, Chapter 3 set forth the procedure which the PSC follows with regard to public utility rate-making. Section 69-3-201, MCA provides that a public utility is required to furnish reasonably adequate service and facilities, and that the charges made by the public utility for such service shall be reasonable and just. Utilities are required to file with the PSC a schedule of rates, tolls and charges, and no changes may be made unless approved by the PSC. Sections 69-3-301 and -302, MCA. The PSC is required to hold a hearing on a rate increase request before it may approve the increase. Section 69-3-303, MCA. The PSC is empowered to investigate on its own motion any rates, tolls, charges, rules, practices and services and after a full hearing to make such changes as may be just and reasonable. Section 69-3-324, MCA.

MPC contends that the Siting Act in effect prohibits the PSC from inquiring into the need for Colstrip 3. MPC argues that by passing the Siting Act, the State took upon itself the "exclusive right" to make crucial decisions regarding

7

resource management. It points out that the Siting Act reflects increasing nationwide public awareness of the environmental and social impacts resulting from construction of major energy facilities, and that the Siting Act also reflects a legislative recognition that additional generation facilities may be needed. It argues that one of the purposes of the Siting Act was to expedite construction of new facilities to meet growing energy demands. Because a new energy facility may not be constructed or operated in Montana without a certificate of environmental compatibility and public need, MPC argues that the BNRC was given the sole responsibility of balancing all factors in deciding which course is best for Montana. MPC emphasizes that a certificate may be issued only after environmental, social and economic concerns and energy needs are weighed and balanced against each other. It points out that safeguards are provided in the Siting Act, such as the requirement that the Department of Health and Environmental Sciences perform extensive studies.

MPC emphasizes that before the BNRC may issue the certificate, it must find there is a need for the facility and that it will serve the public interest, convenience and necessity. It then argues that the determination required of the BNRC with respect to public need is precisely the same as that required of the PSC when it seeks to determine whether property is "actually used and useful" under section 69-3-109, MCA. MPC points out that the certification proceeding before the BNRC is unparalleled in the history of Montana for complexity, length, cost, the efforts expended by the parties, and the heavy burden of proof placed upon the applicant utilities. MPC contends that the PSC chairman has stated that the BNRC's need determination involves precisely the same issues which the PSC considers in its "used and

8

useful" determination. It argues that the inquiry required by the PSC is therefore a needless duplication. It contends that the PSC has refused to give effect to the BNRC's certificate, which determined that Colstrip 3 is needed, and that the PSC is without jurisdiction to investigate whether Colstrip 3 is actually used and useful. MPC contends that the certification proceedings included an advance determination of the used and useful status of the facility. MPC argues that this determination is necessary to justify investor capital commitment, preclude construction of unneeded facilities and allow consideration of all factors in one proceeding. MPC contends that the legislative history of the Siting Act demonstrates that the BNRC determination was meant to be the exclusive determination of need.

Last, MPC argues that passage of the Siting Act created a reasonable doubt as to whether the PSC has power to inquire into the need for Colstrip 3 and that this doubt should be resolved against existence of the power. MPC argues that its position does not require a finding of implied repeal or amendment of section 69-3-109, MCA. MPC contends that the certificate of environmental compatibility and public need merely creates a conclusive evidentiary presumption that the facility is actually used and useful. On the other hand, it contends that adoption of the PSC's position would render the extensive certification proceedings a meaningless charade.

The PSC argues that the Siting Act is designed to avoid unnecessary environmental impacts. By contrast, when a facility begins to operate, the PSC must determine whether the output is "actually" required by the ratepayers. The PSC's primary argument is that this Court should not find that the utility statute has been repealed by implication absent a very strong showing that the legislature intended such a result and that repeal or amendment is a logical

necessity. The PSC argues that it is statutorily required to examine the operations of utilities to determine whether expenses were prudently incurred and should be reflected in the rates. It emphasizes that nowhere in the Siting Act is rate-making treatment for the proposed facilities mentioned. The PSC contends that a logical reading of the Siting Act demonstrates that it is an environmental planning statute. It argues that section 69-3-109, MCA grants the Commission the right to determine whether property is presently useful for rate purposes, as distinguished from the BNRC's reliance on forecasts of future energy needs. It argues that acceptance of MPC's argument would require that Colstrip 3 be included in the rate base for the life of the facility even if everyone agreed that the power was not required by Montana customers.

The PSC also makes extensive arguments as to the extent of its powers. We decline in this case to rule on the scope or extent of the powers of the PSC under Title 69, Chapter 3. We will consider only the narrow question of the Siting Act's impact, if any, on the powers of the PSC.

Other parties have also presented extensive briefs and oral argument. These arguments emphasize the legal theory that no repeal or amendment by implication should be found in this case. They also include extensive arguments regarding the powers of the PSC under the utility regulation statutes. They argue that the BNRC is required to make findings as to specific factors, including the basis for the facility's need and whether it will serve the public interest, convenience and necessity, but that none of these factors is concerned with issues such as property valuation, rate base, or appropriate rates of return to the utility or its investors. They contend that for Siting Act purposes, the cost of the facility is germane only to the amount of the filing fee paid by

MPC when it filed its original application. For purposes of this opinion, we find it unnecessary to consider the balance of the extensive arguments raised.

All parties agree that under section 69-3-109, MCA, the PSC is to investigate and ascertain the value of utility property actually used and useful for the convenience of the public. Our fundamental question is whether the passage of the Siting Act and the issuance of a certificate to MPC under that Act in some manner limits, amends or repeals the power granted to the PSC under section 69-3-109, MCA. Recognizing the strong stand taken by this Court against implied repeal, MPC argues that the effect of certification under the Siting Act is to create a conclusive evidentiary presumption that a certified facility is actually used and useful. Regardless of its characterization, MPC's contention requires a reduction of the power of the PSC under section 69-3-109, MCA by some form of amendment or repeal. If the PSC is precluded from determining whether Colstrip 3 is actually used and useful, then its power has in some manner been reduced or repealed with regard to a certified facility.

In City of Helena v. Montana Department of Public Service Regulation (Mont. 1981), 634 P.2d 192, 38 St.Rep. 1560, a similar argument was considered by this Court. The municipalities argued that under the Municipal Revenue Bond Act, municipalities had been granted rate-making authority with regard to municipally-owned water utilities and that this grant of authority exempted such rates from the rate-setting jurisdiction of the PSC. The municipalities argued that the power of the PSC was irreconcilable with the municipal powers granted to municipalities. 634 P.2d at 196, 38 St.Rep. at 1564. The Bond Act provided that if its provisions were inconsistent with other general, special or local laws, the

11

Bond Act would control. This provision is similar to section 75-20-103, MCA of the Siting Act.

This Court noted that the Bond Act did not expressly repeal the apparently conflicting PSC powers. Similarly, we note that the Siting Act does not expressly repeal or otherwise address the PSC powers granted in the utility regulation statutes, particularly section 69-3-109, MCA. In _City of Helena_, this Court held that the two Acts could be harmonized by allowing municipalities to make an initial determination of rates, while upholding the PSC's power to make a final review of such rates. 634 P.2d at 196, 38 St.Rep. at 1564. With regard to repeal by implication, this Court stated:

> "It must be noted at the outset that the Municipal Revenue Bond Act of 1939 does not expressly repeal the Public Utilities and Carriers Act, Title 69. To give credence to the contentions of the City of Billings would necessitate a finding of repeal by implication. Such repeal by implication is not favored in Montana. _London Guaranty & Accident Co. v. Industrial Acc. Board_ (1928), 82 Mont. 304, 266 P. 1103. This Court has stated that '. . . an implied repeal results only from an enactment, the terms and necessary operation of which cannot be harmonized with the terms and necessary effect of an earlier Act.'" 634 P.2d at 196, 38 St.Rep. at 1564.

This case is directly comparable to _City of Helena_. In _City of Helena_, because the Bond Act made no reference to the PSC or any of its functions, the municipalities were required to argue there had been an implied repeal, which this Court refused to find. Here, in a similar manner, the Siting Act makes no reference to the PSC, to electric utility rates or rate-setting powers, or to any of the laws codified under Title 69.

In _City of Helena_, we held that the Bond Act and the Utility Act were reconcilable, holding that the cities could first set rates and the PSC then could review the rates. In a similar manner, we conclude that the Siting Act and the utility regulation statutes are reconcilable. The primary

aim of the Siting Act is to ensure that the environmental, natural resource and social impacts of a facility are not incurred without an appropriate preliminary showing by the applicant utilities and approval by the BNRC. As indicated by the stated purposes of the Siting Act, the need determination is related primarily to environmental protection rather than rate base treatment for a facility. Unfortunately, there is no helpful legislative history. Because the Siting Act fails to refer to any later rate-making procedures, it appears that the legislature did not reach a decision on that point.

The determination of whether or not a facility is actually used and useful may well be unrelated to the environmental and natural resource concerns underlying the Siting Act. While the public need determination under the Siting Act does include consideration of factors which can be associated with the used and useful concept of the utility regulation statutes, the Siting Act is not limited to determining whether a facility is actually used and useful. The BNRC's findings of fact concerning public need in this case related to anticipated energy needs based upon utility projections. These findings did not attempt to address questions of cost of the facility, the proportion of energy production to be devoted to Montana consumers, or MPC's share of the power to be generated by Colstrip 3.

When read together, the Siting Act and the utility regulation statutes are not inconsistent on the issue before us. Together the Acts describe a two-step process: (1) the utility obtains a certificate from the BNRC under the Siting Act before construction may be commenced; (2) having constructed the plant, the utility requests rate base treatment for the new facility and the PSC then determines whether the facility is actually used and useful. We conclude that there

13

is no inconsistency in the powers granted to the PSC under the utility regulation statutes and the powers granted to the BNRC under the Siting Act. As a result, we conclude that adoption of the Siting Act did not impliedly repeal section 69-3-109, MCA.

We do not suggest that the separate determinations over a term of years constitute the best or most efficient approach to major facility approval and cost recovery. It is unfortunate that after the expenditure of hundreds of millions of dollars, MPC has no indication of whether or not its facility may be charged to its ratepayers even though the BNRC found it to be needed. In the early 1970's it was difficult to forecast the changing energy requirements of the 1980's. However, the balancing of these considerations is for the legislature.

We hold that passage of the Siting Act did not impliedly repeal or otherwise limit the PSC's express statutory rate-making authority under section 69-3-109, MCA.

II

Does the doctrine of collateral estoppel preclude the PSC from considering whether Colstrip 3 is "actually used and useful" under section 69-3-109, MCA?

MPC contends that the doctrine of collateral estoppel, also termed issue preclusion, prohibits a PSC inquiry into the need for Colstrip 3. In substance, MPC contends that the issue of need was determined by the BNRC in its issuance of the certificate of environmental compatibility and public need, and affirmed by this Court on appeal.

In Stapleton v. First Security Bank (Mont. 1983), 675 P.2d 83, 88-89, 40 St.Rep. 2015, 2020-21, this Court affirmed previous holdings that four criteria must be met before collateral estoppel applies. The most significant criterion is that the issues must be the same and must relate to the

14

same subject matter. Further, identity of issues requires that the "precise question" has been litigated in the prior action. 675 P.2d at 89, 40 St.Rep. at 2021.

We conclude that the need issue determined by the BNRC at the time of the issuance of the certificate and the "used and useful" issue before the PSC under its rate determination are not identical. We do not have the records before us so as to compare in detail all of the issues determined by both agencies. The record now before us does not demonstrate that the determination by the BNRC under the Siting Act is the same as the determination required of the PSC under section 69-3-109, MCA.

We conclude that the doctrine of collateral estoppel is not applicable.

### III

Does the doctrine of promissory estoppel require the PSC to include in the rate base MPC's share of costs for Colstrip Unit 3?

The basic principle of promissory estoppel is set forth in Restatement of Contracts 2d, section 90 (1981):

> "A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

In Keil v. Glacier Park, Inc. (Mont. 1980), 614 P.2d 502, 37 St.Rep. 1151, this Court specified four elements of promissory estoppel, the first of which is a promise clear and unambiguous in its terms. 614 P.2d at 506, 37 St.Rep. at 1155-56. MPC argues that as a result of the issuance of the certificate by the BNRC and the promise by MPC to comply with the extensive provisions of the certificate, the State and MPC entered into an implied contractual relationship.

15

The Siting Act does not suggest that issuance of a certificate establishes a contractual relationship between the State of Montana and the applicant utility. MPC argues that the Siting Act contemplates that certified facilities such as Colstrip 3 will be included in the rate base. We do not find any provision in the Siting Act which can be construed to contain that clear and unambiguous promise by the State of Montana or the BNRC. Further, we find no such promise in the language of the certificate itself.

We conclude that the issuance of the certificate did not create a contractual relationship between the State and MPC. The rule is well stated in 5 Mezines, Stein and Gruff, Administrative Law, section 41.01 (1978):

> "A license is a grant by a governmental authority or agency of the right to engage in conduct that would be improper without such a grant. The conferment of a license does not create a contractual relationship between the issuing agency and licensee; it is merely a privilege that may be withdrawn upon some future occurrence." (footnotes omitted)

We conclude that MPC has failed to show a clear and unambiguous promise by the BNRC or the State of Montana either under the provisions of the Siting Act or of the certificate issued to MPC. Without a clear and unambiguous promise, the doctrine of promissory estoppel does not apply. The doctrine of promissory estoppel does not require the PSC to include in the rate base MPC's share of costs for Colstrip 3.

In summary, we conclude that passage of the Montana Facility Siting Act did not reduce the powers granted to the PSC in section 69-3-109, MCA, and that the doctrines of collateral and promissory estoppel are inapplicable.

We hold that the certificate of environmental compatibility and public need issued by the BNRC is not conclusive and binding on the Public Service Commission. The relief requested by MPC is denied.

16

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____
Justices

_____
Hon. Robert W. Holmstrom,
District Judge, sitting in place
of Mr. Justice John C. Sheehy

Mr. Justice Daniel J. Shea joins in the majority opinion,
and, time permitting, will file a separate concurring
opinion.

17